**STATE FARM FIRE & CASUALTY COMPANY, Appellant,**

v.

**Frank S. NEISES, et al., Respondents.**

**No. C2–98–2299.**

Court of Appeals of Minnesota.

Aug. 24, 1999.

William M. Hart, Katherine A. McBride, Meagher & Geer, PLLP, Minneapolis, for appellant.

Bradley C. Eggen, Law Offices of Brad C. Eggen, Minneapolis; and Peter G. Van-Bergen, Andrea E. Reisbord, Cousineau, McGuire & Anderson, Chtd., Minneapolis, for respondents.

Considered and decided by SHORT, Presiding Judge, HARTEN, Judge, and PARKER, Judge.*

## OPINION

HARTEN, Judge.

Appellant insurer sought a declaratory judgment that it was not liable for the judgment acknowledged by its insured in a Miller–Shugart agreement with respondents, the family of the deceased whose corpse the insured had stolen and mutilated. Appellant's motion for summary judgment was denied on the ground that there were material questions of fact as to whether respondents' injury was expected or intended by the insured and whether the insured's acts were willful and malicious. Following trial, a jury determined that the insured did not expect or intend to cause respondents' injuries and that the insured's acts were not willful and malicious. The district court adopted the jury's findings and concluded that the exclusions did not apply. Because we hold that the insured's policy excluded coverage for respondents' injury, we reverse and order entry of summary judgment for appellant.[1]

## FACTS

Justin Neises, nine, son of respondent Frank Neises and stepson, brother, and stepbrother of the other respondents, died in a swimming accident in 1989. His body was placed in a cemetery crypt. In January 1990, Bradley Corty, then age 19, an insured of appellant State Farm, and Casey Miller, also age 19, broke into the crypt, removed Justin's body, dissected it, displayed parts of it to friends, and later dumped it into the river.

After Corty and Miller had been identified as the perpetrators of these acts, respondents brought an action against them and the cemetery. Respondents ultimately settled with the cemetery with a Pierringer release for $65,000, obtained a $1,000,658 default judgment against Miller, and entered into a Miller–Shugart agreement with Corty.

Pursuant to the Miller–Shugart agreement, Corty accepted judgment in the amount of $540,000, of which he agreed to pay $40,000 and respondents agreed to collect the remaining $500,000 only from Corty's insurer. Corty was covered under his parents' umbrella policy with appellant State Farm Fire & Casualty Company (State Farm).[2] The policy provided that State Farm would pay the insureds' net loss for damages they were legally obligated to pay but excluded coverage

> for personal injury or property damage:
>
> (a) which is either expected or intended by you [the insured]; or
>
> (b) to any person or property which is the result of your willful and malicious act, no matter at whom the act was directed.

## ISSUE

■ Does the policy exclude coverage for the insured's acts in robbing a grave,

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

1. Appellant also challenges the validity of the Miller–Shugart agreement and the denial of its motion for a new trial, amended findings of fact and conclusions of law, or judgment notwithstanding the verdict. Because our holding that the policy excluded coverage for respondents' injury renders these issues moot, we do not address them.

2. Corty was also covered under his parents' homeowners' policy, but the parties agree that only the umbrella policy is relevant to this appeal.

mutilating a corpse, and discarding the remains?

## ANALYSIS

### Standard of Review [3]

The interpretation of an insurance policy, including the question of whether a legal duty to defend or indemnify arises, is one of law which this court reviews de novo.

*Auto–Owners Ins. Co. v. Todd,* 547 N.W.2d 696, 698 (Minn.1996) (citing *Iowa Kemper Ins. Co. v. Stone,* 269 N.W.2d 885, 886–87 (Minn.1978)).

### 1. The "Expected or Intended" Injury Exclusion [4]

■ An act can be "expected or intended" if "the character of the act is such that an intention to inflict an injury can be inferred." *Stone,* 269 N.W.2d at 887 (intent inferred from a blow to the victim's head with a belt wrapped around the insured's hand). It is not necessary that the particular injury be intended; the actual injury may be more severe or of a different nature. *Id.; see also R.W. v. T.F.,* 528 N.W.2d 869, 873 (Minn.1995) (intent inferred from insured's knowing failure to disclose that he had genital herpes); *Fireman's Fund Ins. Co. v. Hill,* 314 N.W.2d 834, 835 (Minn.1982) (intent inferred from insured foster parent's sexual abuse of foster child, notwithstanding insured's claim that no actual harm was intended); *Woida v. North Star Mut. Ins. Co.,* 306 N.W.2d 570, 573 (Minn.1981) (intent inferred from

insured's shooting of armor-piercing bullets at truck he knew was occupied); *Continental W. Ins. Co. v. Toal,* 309 Minn. 169, 177–78, 244 N.W.2d 121, 126 (1976) (intent inferred from the fact that insureds carried and used guns during a burglary).

■ Like the insured in *Toal,* who claimed that although he and others were provided with loaded pistols, "it never entered his mind that anyone would be shot." *Toal,* 309 Minn. at 171, 244 N.W.2d at 123. Corty claimed that it never occurred to him that the child's family might be injured psychologically by Corty's acts. *Toal* distinguished *Caspersen v. Webber,* 298 Minn. 93, 213 N.W.2d 327 (1973) (finding no intent to injure when an insured pushed a victim who then fell against a metal rack).

> This is not a case like *Caspersen* where an impulsive, albeit intentional, act results in an unintended injury. * * * [Here,] the insureds followed through with the armed robbery with knowledge that someone might well be injured or killed in the process. * * * In short, the insureds, intentionally prepared themselves to inflict serious injury in order to facilitate the armed robbery. Thus, we find the insureds' acts to be of such a calculated and remorseless character that we infer an "intention to inflict an injury" as a matter of law.

*Toal,* 309 Minn. at 177–78, 244 N.W.2d at 126. Corty, likewise in contrast to the insured in *Caspersen,* did not commit an

---

3. Respondents contend that the issue involves review of the jury's special verdict and cite *Hanks v. Hubbard Broadcasting, Inc.,* 493 N.W.2d 302, 309 (Minn.App.1992) (stating that "answers to special verdict questions will not be set aside unless they are perverse and palpably contrary to the evidence"), *review denied* (Minn. Feb. 12, 1993). But the appropriate standard of review is de novo. *See Caspersen v. Webber,* 298 Minn. 93, 97–98, 213 N.W.2d 327, 330 (1973) (although the trial court submitted to the jury the fact question of whether the defendant intentionally caused the plaintiff's bodily injury, the court "correctly recognized that the extent of coverage under the terms of the policy was a question of law").

4. The district court found ambiguity because the policy excludes liability for injuries intended by the insured but provides coverage for injuries resulting from specified intentional torts committed by an insured. None of these torts is alleged here, so the ambiguity issue is irrelevant. Moreover, in a case where a policy provided coverage for injuries resulting from false imprisonment but excluded liability for injuries intended by the insured, the exclusion was held to apply to liability resulting from false imprisonment occurring as part of a sexual assault because the insured's "overall intentional plan" was sexual assault, not false imprisonment. *See Todd,* 547 N.W.2d at 699.

impulsive act that resulted in unintentional injury. Instead, like the insureds in *Toal*, he followed through with his plan to steal and dismember a child's corpse, also an act of "a calculated and remorseless character," in order to satisfy his morbid curiosity, despite his knowledge that there was, as he agreed, a "high probability" that the child had a family. If intent to cause physical injury can be inferred from striking or shooting, intent to cause emotional and psychological injury to a child's family may be inferred from stealing, dismembering, displaying, and discarding a child's corpse. *See Larson v. Chase*, 47 Minn. 307, 312, 50 N.W. 238, 240 (1891) (holding "too plain to admit of argument" the view that injury to the feelings is the natural and proximate result of knowledge that the remains of a deceased family member have been mutilated).

### 2. The "Willful and Malicious Act" Exclusion

■ "A person who intentionally, willfully, and knowingly destroys, mutilates, injures, disturbs, or removes human skeletal remains or human burial grounds, is guilty of a felony." Minn.Stat. § 307.08, subd. 2 (1998). Corty purposefully entered a cemetery, opened a crypt, pried open a coffin, removed a corpse to another place, mutilated and displayed its parts, and dumped the remains in the river. Thus the wrongful nature of Corty's acts is readily established.

> Whatever is done *willfully and purposefully*, if it be at the same time wrong and unlawful and that known to the party, is of legal contemplation malicious.

*Allen v. Osco Drug, Inc.*, 265 N.W.2d 639, 644 n. 6 (Minn.1978). Corty acted purposefully. What he did was wrong and unlawful, and Corty's knowledge that it was wrong and unlawful is evident from his testimony.

Corty nonetheless testified that he neither intended to harm respondents nor thought about harming them. Assuming without deciding that this is true, we hold that Corty's malice need not have been directed at respondents: the exclusion applies to injury resulting from a "willful and malicious act, no matter at whom the act was directed." The fact that Corty acted out of morbid curiosity rather than from a desire to harm does not mean that his act was not willful or malicious; policy exclusions for intentional, willful, or malicious acts have been applied regardless of the insured's state of mind. *See, e.g., D.W.H. v. Steele*, 512 N.W.2d 586, 589 (Minn.1994) (argument that insured, a child of 11 or 12 who committed sexual assaults, could not have formed the requisite intent to harm rejected—insured's act excluded from coverage); *American Family Mut. Ins. Co. v. Peterson*, 405 N.W.2d 418, 421–22 (Minn. 1987) (argument that insured's intoxication prevented him from forming the requisite intent to harm when he committed an assault rejected—assault excluded from coverage); *State Farm Fire & Cas. Co. v. Williams*, 355 N.W.2d 421, 423, 425 (Minn. 1984) (intentional acts exclusion applied even though insured and victim stipulated that insured did not intend to inflict physical or mental suffering).

Respondents rely on *German Mut. Ins. Co. v. Yeager*, 554 N.W.2d 116, 118 (Minn. App.1996) (when an insured deliberately threw an explosive device in a direction away from the victim, lack of intent to injure could be inferred from the insured's state of mind), *review denied* (Minn. Dec. 23, 1996). But *Yeager* is distinguishable. There, the insured was not indifferent to the possibility of injuring the victim; he specifically intended to avoid the injury and felt great remorse when it happened. Corty cannot argue that he was intending to avoid injuring respondents, and he testified that he felt no remorse at the time.

Moreover, as the supreme court observed in *Peterson*, 405 N.W.2d at 422:

> [P]olicy language is to be construed in accordance with the reasonable expectations of the insured * * *.

> The policyholder's expectations are to be considered in light of the purpose of the intentional act exclusion. This pur-

pose, it is frequently said, is to deny the insured license to commit wanton and malicious acts. Here, judging from all outward manifestations, [the insured's] actions, although bizarre, qualify as wanton and malicious. * * * [W]e do not think an insured reasonably expects his assault committed while voluntarily intoxicated to be within his policy coverage any more than an assault committed while sober. * * * Finally, we are not inclined to create a situation where the more drunk an insured can prove himself to be, the more likely he will have insurance coverage.

(Citations omitted.) Correspondingly, we reject the extension of coverage to such egregious acts as grave robbing and corpse mutilation, given the purpose of the exclusion to "deny the insured license to commit wanton and malicious acts." Nor do we think it likely that coverage for liability resulting from grave robbing and corpse mutilation is a reasonable expectation for purchasers of the insurance policy at issue. Both because Corty's acts were willful and malicious and because his intent to harm respondents can be inferred from the nature of his acts, we hold that coverage for liability resulting from those acts was excluded from the State Farm umbrella policy.

## DECISION

Because the policy specifically excludes coverage for the liability at issue here, we reverse the judgment of the district court and order that summary judgment be entered for State Farm.

**Reversed.**