**AMERICAN FAMILY INSURANCE COMPANY, Respondent,**

v.

**Andy WALSER, Respondent,**

Matthew Jewison, a minor by and through Gary Jewison, his parent and natural guardian, et al., Petitioners, Appellants,

Jason Shoemaker, Blue Cross and Blue Shield of Minnesota, Respondents.

No. C1–00–349.

Supreme Court of Minnesota.

July 5, 2001.

Philip R. Reitan, Mankato, for appellant.

Steven J. Hovey, Hoversten, Johnson, Beckmann, Wellman & Hovey, LLP, Austin, for respondent American Family Ins. Co.

Jane McMahon, St. Paul, for respondent Blue Cross Blue Shield.

Andy Walser, Mapleton, pro se.

Jason Shoemaker, Fort Sill, OK, pro se.

## OPINION

PAUL H. ANDERSON, Justice.

Appellant Matthew Jewison was injured after falling from the rim of a basketball hoop from which he had been hanging by his hands. Jewison fell because two of his acquaintances pulled on his ankles, causing him to lose his grip on the rim. After receiving medical treatment and therapy for the injury, Jewison sued the two acquaintances, one of whom was covered by a homeowner's policy issued by American Family Insurance. American Family then initiated a declaratory judgment action, alleging that it had no duty to defend or indemnify. American Family argued that no coverage existed under the policy for

the insured's actions because the insured acted intentionally, even if he did not intend to harm Jewison. The district court concluded as a matter of law that the insured's actions were intentional, but that the resulting injury was not intentional, and therefore, American Family had a duty to defend and indemnify the insured. The Minnesota Court of Appeals reversed, concluding that there was no coverage because the insured committed a tortious act, the act was intentional, and therefore the act could not be considered an accident. We reverse.

On May 6, 1996, Matthew Jewison, Andy Walser, Jason Shoemaker, and other students were in a gym at the Mapleton High School. At the time, Jewison was in the ninth grade, Walser was in the tenth grade, and Shoemaker was in the twelfth grade. The three were in the gym because their choir teacher had asked them to move some chairs.

Jewison gave the following version of what happened in the gym. Jewison, who was about 6 feet 4 inches tall, jumped up and began hanging by his hands from the rim of a basketball hoop. After hanging from the rim for about 5 to 10 seconds, Walser and Shoemaker grabbed Jewison's ankles and began tugging on them. Jewison characterized their actions as "just goofing around" and "playing around and stuff." Walser and Shoemaker were standing under the basketball hoop facing Jewison as they held his ankles. Walser and Shoemaker backed up a bit while holding Jewison's ankles, but then let go. Jewison held onto the rim for another 10 to 20 seconds and then Walser and Shoemaker grabbed Jewison's ankles another time. Walser and Shoemaker again backed up while holding Jewison's ankles, "pulled harder," and this time Jewison lost his grip on the rim and fell to the floor. After Jewison lost his grip but before he

hit the floor, Walser and Shoemaker let go of his ankles. Jewison, "by instinct," used his left hand to break his fall, injuring the middle finger in his left hand. Walser and Shoemaker both apologized to Jewison and when asked if he thought Walser and Shoemaker intended to injure him, Jewison responded, "No, not at all."

Walser's version of what happened differed only slightly from Jewison's. Walser stated that Jewison jumped up and grabbed the rim a couple of times before the incident happened. On the last time Jewison jumped up, he hung on the rim. Walser told him to get down because he was not supposed to be hanging from the rim. Walser stated that he and Shoemaker each grabbed one of Jewison's ankles, but he could not recall if they pulled Jewison in any specific direction. Walser thought that he and Shoemaker pulled Jewison "close to straight down." Walser gave the following description of how Jewison fell. "I think he landed a little bit on his feet first and then kind of pushed himself backwards. And that was when he put his arms back."

Walser stated that he and Shoemaker were just "goofing around" and did not have any hostile feelings toward Jewison; instead, everything was done in a friendly manner. Walser stated that although he and Shoemaker intended to pull Jewison down from the rim, they did not intend to injure him. Walser agreed with the statement that his pulling on Jewison's ankles was "[j]ust one of the things that high schoolers may do."

Jewison testified that he had jumped up and hung on basketball rims "hundreds" of times before the May 1996 incident. In all of those times, he never injured himself doing so. Nor had he ever witnessed anyone else get injured from holding onto the rim and then falling down. Walser testified that before the May 1996 incident, he

jumped up and hung from basketball rims a "couple dozen" times. He also witnessed others doing the same thing. Although the Mapleton basketball coaches had told the students not to hang from the rims, Walser had never seen anyone injured from doing so before Jewison was injured.

In his fall from the basketball rim, Jewison injured his third metacarpal knuckle. For 6 months after the fall, Jewison received therapy for this injury. Jewison's medical insurer, Blue Cross Blue Shield, paid $8,399.40 in medical bills as a result of his injury. Jewison and his father commenced an action against Walser and Shoemaker to recover these losses. Walser, who was insured through his parents' policy with American Family, tendered his defense to the insurance company.

American Family initiated a declaratory judgment action, asking the district court to conclude that American Family had no duty to defend or indemnify Walser. American Family asserted two reasons why it should not have such a duty. First, American Family argued that its policy does not cover the May 1996 incident because it was not an "occurrence" as defined in the coverage provision of the policy. Second, American Family asserted that the incident was the result of an intentional act by Walser and therefore coverage was excluded by the intentional act exclusion.

The parties agreed to submit the matter to the district court based on Jewison's and Walser's depositions. Relying on *Hauenstein v. St. Paul–Mercury Indem. Co.*, the court found that Jewison's injury was caused by an accident because it was "an unexpected, unforeseen, or undesigned happening or consequence * * *." 242 Minn. 354, 358, 65 N.W.2d 122, 126 (1954). The court also found that while Walser intended to pull Jewison down from the rim, he did not intend to injure Jewison.

The court stated that as a matter of law Walser's actions "were intentional but the resulting injury was both unexpected and unintended and was therefore an accident." Further, the court found that the facts in this case did not warrant inferring intent to injure as a matter of law. The court then went on to conclude that as a matter of law the incident was an occurrence for purposes of the American Family policy, so coverage did exist and American Family had a duty to defend and indemnify Walser.

American Family appealed to the court of appeals. The court of appeals reversed in an unpublished opinion, concluding that Walser and Shoemaker committed an intentional tort when they grabbed Jewison's ankles. *Am. Family Ins. Co. v. Walser*, No. C1–00–349, 2000 WL 1182799, at *2 (Minn.App. Aug. 22, 2000). The court reasoned that because the injury resulted from an act that was both intentional and wrongful, it could not be considered an accident. *See id.* Therefore, the incident was not an occurrence as required for coverage under American Family's policy. *Id.* In reaching this conclusion, the court focused on whether Walser *intended to act* and in doing so acted wrongfully, not on whether Walser *intended the harm*. *Id.* The court then stated that it was unnecessary to decide whether the incident would also be excluded from coverage through the intentional act exclusion provision because of the court's conclusion that coverage did not exist in the first place. *Id.* at *2, n. 2. However, the court did note in a footnote that intent to injure could be inferred as a matter of law under the circumstances in this case. *Id.* at *2, n. 1.

Jewison appealed and argues that because Walser had no intent to injure him, the incident in which he was injured was an accident under the American Family policy. He also asserts that this is not an

incident in which intent to injure should be inferred as a matter of law.

## I.

Interpretation of an insurance policy and application of the policy to the facts in a case are questions of law that we review de novo. *Franklin v. Western Nat'l Mut. Ins. Co.,* 574 N.W.2d 405, 406 (Minn.1998). When interpreting an insurance contract, words are to be given their natural and ordinary meaning and any ambiguity regarding coverage is construed in favor of the insured. *Hauenstein,* 242 Minn. at 357, 65 N.W.2d at 125.

There are two provisions of the American Family policy relevant to this appeal. The first is the coverage provision, which requires that Jewison must have been injured in an occurrence. The policy contains the following coverage terms under "Description of Liability and Medical Expense Coverages":

1. Insuring Agreement. We will pay, up to our applicable limit, compensatory damages which any insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies. The bodily injury or property damage must be caused by an occurrence during the policy period. The occurrence must take place in the coverage territory.

(Emphasis omitted.) The coverage provision of the policy also provides the following definition of occurrence:

*Occurrence* means an *accident,* including continuous or repeated exposure to substantially the same general harmful conditions.

(Emphasis added.)

The second provision of the policy relevant to this appeal is the exclusionary provision, which is included under the "Exclu-

sions" section of the policy. This provision contains the following language:

11. Intentional Injury. We will not pay for damages due to bodily injury or property damage expected or intended from the standpoint of the insured.

(Emphasis omitted.)

The coverage provision of American Family's policy provides coverage for damages resulting from an occurrence, which the policy defines as an accident. However, the policy does not define accident. In interpreting the word accident, we are guided by the maxim that in insurance contracts, coverage provisions are construed according to the expectations of the insured and exclusions are construed narrowly. *Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co.,* 366 N.W.2d 271, 276 (Minn.1985). When applying this maxim to coverage provisions of an accident policy, we established that the word accident encompasses both the acts of the insured and the consequences of the insured's acts. *Hauenstein,* 242 Minn. at 358–59, 65 N.W.2d at 126. In *Hauenstein,* we concluded that an insurance policy did provide coverage for damage caused to the walls of a building by the application of defective plaster. 242 Minn. at 358, 65 N.W.2d at 126. We reasoned that the damage was accidental because it was a "completely unexpected and unintended result." *Id.* We concluded that "[a]ccident, * * * within the terms of an accident policy, is an unexpected, unforeseen, or undesigned happening or consequence * * *." 242 Minn. at 358–59, 65 N.W.2d at 126.

In 1976, when considering the *Hauenstein* definition of accident, we noted that "this definition or a similar one is universally accepted by the courts * * *." *Bituminous Cas. Corp. v. Bartlett,* 307 Minn. 72, 80 n. 5, 240 N.W.2d 310, 313, n. 5. We also noted the difficulties that the *Hauen-*

*stein* definition has caused courts in interpreting insurance provisions. *Bartlett,* 307 Minn. at 80, 240 N.W.2d at 313. We mentioned accident definitions from other jurisdictions, including one which defined accident as "all negligently caused injury, provided such injury was not intentional," but we did not endorse any of these other definitions. *Id.* Because the policy at issue in *Bartlett* provided its own definition of accident, we did not need to resolve any problems with the *Hauenstein* definition. *Bartlett,* 307 Minn. at 80, 240 N.W.2d at 313. But, while we did not rely on the *Hauenstein* definition of accident to reach our decision in *Bartlett,* our analysis indicated that the *Hauenstein* language was not applicable because there was specific contract language defining accident. *Bartlett,* 307 Minn. at 80, 240 N.W.2d at 313. The *Hauenstein* definition of accident includes circumstances where the injury was unintended or unexpected. *Hauenstein,* 242 Minn. at 358–59, 65 N.W.2d at 126. But we note that the *Hauenstein* definition did not focus on whether the conduct that caused the injury was intentional. *Hauenstein,* 242 Minn. at 358–59, 65 N.W.2d at 126.

Following *Hauenstein* and *Bartlett,* the court of appeals strayed from the *Hauenstein* definition in a series of cases interpreting coverage provisions. The first case, *Sage Co. v. INA,* involved an insurance claim by a partnership in an employment discrimination suit resulting from firing an employee. 480 N.W.2d 695, 697 (Minn.App.1992). In deciding whether the intentional firing of an employee was an accident under the policy, the court of appeals used only part of the *Hauenstein* definition, stating that an accident is "an unexpected, unforeseen, or undesigned happening * * *." *Sage,* 480 N.W.2d at 698. The court in *Sage* did not explain why it dropped the words "or consequence" from the *Hauenstein* definition.

*Id.* Two months later, the court of appeals relied on the shortened definition of accident from *Sage* when it decided a case involving the transmission of herpes. *Milbank Ins. Co. v. B.L.G.,* 484 N.W.2d 52, 58 (Minn.App.), *rev. denied* (Minn. July 16, 1992). In *Milbank,* the court of appeals also took from *Bartlett* a definition of accident that we referenced but did not adopt in *Bartlett. Milbank,* 484 N.W.2d at 58. This definition stated that an accident "includes all negligently caused injury, provided such injury was not intentional." *Id.*

Relying on *Sage* and *Milbank,* the court of appeals developed a new test for determining whether an incident was an accident. This test involves ascertaining whether the insured's conduct was wrongful. *Gilman v. State Farm Fire & Cas. Co.,* 526 N.W.2d 378, 383 (Minn.App.1995). In *Gilman,* the jury found that the insured intentionally tackled Gilman, but that the resulting injury was not intentional. *Id.* at 381. In considering the impact of the jury verdicts on coverage, the court of appeals discussed for the first time the fact that it had dropped the words "or consequence" from the *Hauenstein* definition of accident, but distinguished *Hauenstein* as a property damage case that did not involve "wrongful conduct." *Gilman,* 526 N.W.2d at 382. The court concluded that because the act of tackling was a tortious and nonconsensual act, it would not be considered an accident, even if the insured did not intend to injure. *Id.* at 383. When the court of appeals decided the present case, it followed the *Gilman* test and concluded that because Walser's conduct was tortious, lack of intent to injure was irrelevant when determining whether the incident at issue was an accident. *Walser,* 2000 WL 1182799, at *2.

During this same time period, we developed a related analysis that we have used in determining whether an insured acted

intentionally for purposes of an intentional act exclusion in an insurance policy. In order for coverage to be excluded as intentional, a court must find that the insured acted with "specific intent to cause" harm and that the insured "intended the harm itself, not merely that the insured generally intended to act." *R.W. v. T.F.*, 528 N.W.2d 869, 873 (Minn.1995).[1] When applying this principle, we inquire into the intentions of the insured, but we do not inquire whether the insured's conduct was wrongful. *E.g., see id.* Thus, there is coverage for an incident "when the act inflicting the assault and battery is intended, but the resulting injury is not intended." *Woida v. N. Star Mut. Ins. Co.,* 306 N.W.2d 570, 573 (Minn.1981). We note, though, that to find that an insured acted intentionally, a court need only find that the insured intended some harm, not that the insured intended the specific harm that resulted. *Iowa Kemper Ins. Co. v. Stone,* 269 N.W.2d 885, 887 (Minn.1978).

After considering our jurisprudence and the court of appeals' analysis leading to the definition of the word accident, we reject the court of appeals' analysis because it excludes the inquiry into whether there was intent to injure. The result of the application of the court of appeals' test from *Gilman* is that the coverage analysis is more restrictive—results in narrower coverage—than our intentional act exclusion analysis. This result is problematic, and the court of appeals recognized the need to avoid this illogical result in *Milbank* when it stated, "[i]t makes little sense to give a narrower reading to 'occurrence' than we do to an exclusion from coverage for the 'occurrence.'" 484 N.W.2d at 58. In addition, the test used in *Gilman* departs from our precedent in

*Hauenstein* and *Bartlett.* The court of appeals' rationale that *Hauenstein* involved property damage rather than personal injury is not sufficient justification for a more stringent test for coverage. Nor does the characterization of conduct as tortious or wrongful support the imposition of a narrower definition of accident when evaluating coverage. All conduct that leads to liability for personal injury or property damage is in some sense tortious or the defendant would not be liable. To the extent that wrongful conduct may warrant different treatment, it makes more sense to address it in the context of an intentional act exclusion.

 We conclude that the *Hauenstein* definition of accident as *an unexpected, unforeseen, or undesigned happening or consequence* remains applicable and should have been used in the present case. While we reject the court of appeals' narrower definition of accident, we are mindful of our acknowledgment in *Bartlett* that the *Hauenstein* definition has proved troublesome in application. We believe that the appropriate solution is to recognize the relationship between the definition of accident in the analysis of coverage provisions and the definition of intentional conduct in the analysis of intentional act exclusions. It would be preferable-at least in terms of common sense expectations of the meaning of contractual provisions-that a general coverage provision provide a broad scope of coverage that is then limited by a specific exclusion. However, in the absence of a workable definition of accident that yields such a result, it is better here to acknowledge that accidental conduct and intentional conduct are opposite sides of the same coin. The scope of one in many respects defines the scope of the other.

---

1. The intentional act exclusion at issue in *R.W.* is similar to the one in the American Family policy at issue here in that it excludes

coverage for injury "caused intentionally" by the insured. *R.W.,* 528 N.W.2d at 872.

Therefore, in applying the *Hauenstein* definition of accident to a coverage provision, particularly the *unexpected, unforeseen or undesigned consequence* aspect, our cases interpreting intentional act exclusions are instructive; that is, where there is specific intent to cause injury, conduct is intentional for purposes of an intentional act exclusion, and not accidental for purposes of a coverage provision. As was the case under the *Hauenstein* definition, where there is no intent to injure, the incident is an accident, even if the conduct itself was intentional.

Reconciling the scope of the coverage concept of accident and the exclusion concept of intentional act exclusions is not a new idea. In *Tower Ins. Co. v. Judge,* the U.S. District Court, reviewing Minnesota law, stated that "the question whether [the victim's] death was an 'accident' and the question whether the intentional act exclusions apply are, for all practical purposes, identical issues." 840 F.Supp. 679, 690 (D.Minn.1993). Other state courts have also adopted like inquiries for the determination of whether an event is an accident and whether an insured acted intentionally. *E.g., Physicians Ins. Co. of Ohio v. Swanson,* 58 Ohio St.3d 189, 569 N.E.2d 906, 908 (1991); *see Lititz Mut. Ins. Co. v. Bell,* 352 Md. 782, 724 A.2d 102, 110 (1999); *Fire Ins. Exch. v. Diehl,* 450 Mich. 678, 545 N.W.2d 602, 605–06 (1996). Additionally, some insurance policies combine the coverage and intentional act exclusion issues into one provision. *E.g., Woida,* 306 N.W.2d at 572–73 (where the policy defined an occurrence as "an accident * * * neither expected nor intended from the standpoint of the insured"). Finally, we have used the word accident in automobile policies to mean an "unexpected happening without intention or design" and suggested that the use of the term accident in the no-fault act may have been intended to incorporate an intentional act exclusion. *Weis v. State Farm Mut. Auto. Ins. Co.,* 242 Minn. 141, 145, 64 N.W.2d 366, 368 (1954); *McIntosh v. State Farm Mut. Auto. Ins. Co.,* 488 N.W.2d 476, 477–79 (Minn.1992).

■ We do not conclude or suggest that the scope of coverage for accidents will always coincide with the scope of an exclusion for intentional acts. Rather, we conclude that in analyzing whether there was an accident for purposes of coverage, lack of specific intent to injure will be determinative, just as it is in an intentional act exclusion analysis.[2]

■ Here, the American Family policy provides coverage for bodily injury caused by an occurrence, which in turn is defined as an accident. When the policy is construed with our definition of accident, the policy provides coverage for bodily injury caused by an incident in which the resulting harm was unintended or unexpected by

2. The dissent and American Family assert that the *Hauenstein* definition of accident that includes both unforeseen happening and unforeseen consequences cannot be used here because of the specific language in the American Family policy that speaks in terms of coverage for "injury caused by an occurrence." American Family asserts that defining accident (and therefore occurrence) as an unforeseen consequence—injury—yields a grammatically unsound result in that the policy would provide coverage where "injury is caused by an unforeseen injury." American Family argues that injury can only be caused by an event, so the focus must be only on whether the event was intended. This argument fails because the proper analysis cannot be driven merely by the syntax chosen for defining an accident. Although expressed as an unforeseen happening or consequence in *Hauenstein,* without changing the meaning, the definition of accident could just as easily have been stated as "an unforeseen happening or a happening that results in unforeseen consequences." Such wording would avoid the inconsistency relied on by American Family and the dissent.

the insured. To determine whether Jewison's injury was unintended by Walser, we must determine whether Walser acted with specific intent to cause Jewison's injury. *R.W.*, 528 N.W.2d at 872. The district court found that although Walser acted intentionally, he did not intend to injure Jewison. There is nothing in the record to suggest that this finding was in error, nor has American Family argued that it was. Therefore, we conclude that Jewison was injured in an accident. Based on the language of the policy, our definition of accident, and the finding of the district court, we hold that Jewison was injured in an occurrence as defined by the coverage provision of American Family's policy.

## II.

■ Our conclusion that Jewison has shown that the May 1996 incident falls within the coverage provision of American Family's policy does not end our inquiry. We next must consider whether the exclusionary provision of American Family's policy should operate to deny coverage. When interpreting insurance policies, we construe language in an exclusionary provision in accordance with the expectations of the insured party. *American Family Mut. Ins. Co. v. Peterson*, 405 N.W.2d 418, 422 (Minn.1987). We also construe exclusions strictly against the insurer. *Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 327 (Minn.1993).

The district court found that Walser acted intentionally, but that he did not have specific intent to injure Jewison. We already have concluded that this finding was not erroneous. We have stated that the purpose of intentional act exclusions is to exclude insurance coverage for wanton and malicious acts by an insured, and therefore we may, absent a finding of specific intent to injure, infer intent to injure as a matter of law. *Farmers Ins. Exch. v. Sipple*, 255

N.W.2d 373, 375–76 (Minn.1977). We do so based on the circumstances and nature of the insured's actions. *R.W.*, 528 N.W.2d at 873. Therefore, in this case, because there is no actual intent to injure, the intentional act exclusion will only defeat coverage if there is a basis to infer intent to injure as a matter of law.

■ We have previously stated that the inference of intent to injure as a matter of law arises when the insured acted in a calculated and remorseless manner or when the insured's actions were such that the insured knew or should have known that a harm was substantially certain to result from the insured's conduct. *Cont'l Western Ins. Co. v. Toal*, 309 Minn. 169, 177–78, 244 N.W.2d 121, 126 (1976); *R.W.*, 528 N.W.2d at 873. The mere fact that the harm was a "natural and probable consequence" of the insured's actions is not enough to infer intent to injure. *Toal*, 309 Minn. at 174, 244 N.W.2d at 124.

■ There is no bright line rule as to when a court should infer intent to injure as a matter of law; rather, the determination is made through a "case by case factual inquiry." *R.W.*, 528 N.W.2d at 873. In *Brown v. State Auto. & Cas. Underwriters*, we were asked to infer intent to injure when the insured struck a baggage clerk after an argument and tug-of-war over a piece of luggage. 293 N.W.2d 822, 823–25 (Minn.1980). In concluding it was not appropriate to infer intent to injure under those circumstances, we noted that the cases in which we inferred intent to injure were "factually more extreme." *Id.* at 824. In *Caspersen v. Webber*, we declined to infer intent to injure because even though the insured intentionally pushed a hat-check girl, causing her to be injured, the character of the insured's act was not such that an intent to injure could be inferred as a matter of law. 298 Minn. 93, 98–99, 213 N.W.2d 327, 330 (1973). The court of

appeals has also recognized that inferring intent to injure is not appropriate in all circumstances. *German Mut. Ins. Co. v. Yeager*, 554 N.W.2d 116, 118 (Minn.App.), *rev. denied* (Minn. Dec. 23, 1996). In *Yeager*, the court of appeals declined to infer intent when the insured was a teenager who injured a friend while exploding an explosive device when the insured had exploded such a device in the past without injuries and the insured threw the device away from bystanders. *Id.*

This case by case factual inquiry has led us to infer intent to injure as a matter of law in certain circumstances. In *Woida*, we inferred intent to injure when the insured drove to a construction site armed with a high-powered rifle loaded with armor-piercing bullets and fired at a guard's truck, which he knew was occupied. 306 N.W.2d at 573–74. In *Toal*, we inferred intent to injure when the insured armed himself with loaded weapons to facilitate a robbery. 309 Minn. at 177, 244 N.W.2d at 126. We concluded that the robbery was a "well planned operation" in which the insured knew that "someone might well be injured or killed" and thus the insured's actions were "of such a calculated and remorseless character" that it was appropriate to infer intent to injure as a matter of law. *Id.*

We also have inferred intent to injure in a number of cases involving some type of sexual contact. In *R.W.*, we inferred intent to injure when the insured had unprotected sexual intercourse even though he knew or should have known that he had herpes. 528 N.W.2d at 873. We reasoned that T.F.'s decision to engage in unprotected sexual intercourse knowing of the high probability that he could infect R.W. with herpes made the transmission of herpes an intentional act as a matter of law. *Id.* In *Fireman's Fund Ins. Co. v. Hill*, we inferred intent to injure when the insured

had sexual contact with a minor foster child placed in his home. 314 N.W.2d 834, 835 (Minn.1982). We based this conclusion on the fact that "Hill intended to engage in sexual play" knowing that the welfare department viewed sexual contact as detrimental to the child and that Hill had been confronted with accusations that he had assaulted children in the past. *Id.*

■ These cases provide examples of situations where there was a basis to infer intent to injure. In each case, the insureds acted in a manner in which they knew or should have known that some harm was substantially certain to result; that is, they acted with deliberate and calculated indifference to the risk of injury. *R.W.*, 528 N.W.2d at 873; *Hill*, 314 N.W.2d at 835; *Woida*, 306 N.W.2d at 573–74; *Toal*, 309 Minn. at 177, 244 N.W.2d at 126. Therefore, we conclude that in order to infer as a matter of law that Walser intended to injure Jewison, we must conclude that Walser acted with deliberate and calculated indifference to the risk of injury to Jewison.

■ The district court concluded as a matter of law that it could not infer that Walser intended to injure Jewison. We agree with this conclusion. After comparing the facts in this case to those in which we have inferred intent to injure in the past, we conclude, as we did in *Brown*, that the cases in which we infer intent to injure are factually more extreme than those presented here. Jewison, Walser, and Shoemaker were teenage boys "goofing around" in a high school gym. The record shows that both Jewison and Walser had hung by their hands from a rim of a basketball hoop on numerous occasions and had witnessed others doing so, but neither of them had ever seen anyone injured from a fall from a rim. Jewison testified that he had fallen while attempting to hang from the rim in the past, and

even though he had occasionally not landed on his feet, he was never injured from such falls. There is nothing in the record to suggest that Walser acted with deliberate and calculated indifference to the risk of injury to Jewison. Following the reasoning we used in *Toal,* Walser's actions were more like those of the insured in *Caspersen*—impulsive actions which resulted in an unintentional injury. 244 N.W.2d at 126 (referring to *Caspersen,* 298 Minn. at 98–99, 213 N.W.2d at 330). Therefore, we conclude that intent to injure should not be inferred as a matter of law. Because we have concluded that there was no actual intent or expectation to injure and that intent to injure should not be inferred in this case, the intentional act exclusion in the American Family policy does not exclude coverage. We hold that the district court was correct when it found that American Family has a duty to defend Walser and to indemnify him for any judgment rendered against him.

Reversed and remanded.

STRINGER, Justice (dissenting).

I respectfully dissent. The insurance policy at issue here provides coverage if the insured becomes legally obligated to pay damages for "bodily injury or property damage * * * caused by an occurrence during the policy period." The term "occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy also states that it "will not pay for damages due to bodily injury or property damage expected or intended from the standpoint of the insured." Under the language of the insurance policy, it makes no difference whether the insured intended injury or not—the only concern is whether the act causing the injury was accidental or intentional.

It is undisputed that Jewison, a ninth grade student, was injured when he fell from where he was hanging from the rim of a basketball hoop to a gymnasium floor. It is also undisputed that Walser, a sophomore, and Shoemaker, a senior, deliberately and repeatedly tugged at Jewison's ankles in an attempt to get him down from the basketball rim. Jewison testified that the boys backed up while pulling on his ankles so that he hung from the rim at an angle. Walser acknowledged they might have been pulling Jewison's legs at an angle. Jewison fell when, after repeated attempts to dislodge Jewison from the basketball rim, Walser and Shoemaker both took hold of his ankles and pulled harder and at an angle from a direct line to the floor, causing him to lose his grip.

Beginning, as we must, with the language of the policy, *Franklin v. Western Nat'l Mut. Ins. Co.,* 574 N.W.2d 405, 407 (Minn.1998), the American Family insurance agreement provides:

> We will pay, up to our applicable limit, compensatory damages which any insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies. The bodily injury or property damage must be caused by an occurrence during the policy period. The occurrence must take place in the coverage territory.

(emphasis removed). An occurrence, under the policy definition, is "an accident * * *." Thus the policy provides coverage for bodily injury "caused by an accident." "Accident," as we defined it in *Hauenstein,* "is an unexpected, unforeseen, or undesigned happening or consequence * * *." 242 Minn. at 358–59, 65 N.W.2d at 126. Where the majority errs is in concluding that "an accident" is a "consequence" it is not, and that analysis ignores the plain policy language stating that "an accident"

must be the cause of the bodily injury. Clearly, Jewison's injury here was not caused by an accident for the simple reason that Walser and Shoemaker acknowledged that they intended to pull Jewison from the rim of the basketball hoop. His fall was not "an unexpected, unforeseen, or undesigned happening or consequence" it was fully intended. Thus, under the plain language of the insurance policy here, I would conclude there is no coverage.

Coverage is also barred by the intentional acts exclusion. Paragraph 11 of the American Family policy provides an exclusion for intentional injury: "*We* will not pay for damages due to *bodily injury* or *property damage* expected or intended from the standpoint of the insured." (emphasis in original). Jewison characterized the incident as "just goofing around." An inference of intent to cause bodily injury arises and the insured's conduct falls within the intentional injury exception of an accident policy however where the insured's actions are such that the insured knew or should have known "that harm was substantially certain to result" from that conduct. *See, e.g., R.W. v. T. F.*, 528 N.W.2d 869, 872 (Minn.1995); *State Farm Fire & Cas. Co. v. Wicka*, 474 N.W.2d 324, 329 (Minn.1991).

The majority strains to redefine the common sense notion of accident to reach the conclusion that because the injury was not specifically intended, the event must have been an accident.[1] But when Walser and Shoemaker repeatedly pulled on Jewison's ankles, they accomplished precisely what they intended to cause him to lose his grip on the hoop and to fall. Where does their intentional conduct end just before Jewison crashed to the floor injuring himself? How does what Walser and Shoemaker did here differ from pushing Jewison to get him off a ledge injury is likely if not certain to occur. Jewison's fall from the basketball rim was not an accident. It was the foreseeable and expected result of repeated tugs on his ankles by his two older classmates pulling at an angle below him on the floor. Indeed, it is difficult to imagine a scenario in which injury is more likely to occur than where a young boy is hanging by his hands from a narrow metal rim several feet above a hard floor and his feet are pulled at an angle from under him by the two older boys, causing his fall. Only a suspension of the law of gravity could have interceded to prevent the ensuing injury.

The majority states that an insured's conduct does not fall within the intentional injury exception unless the insured "acted with deliberate and calculated indifference to the risk of injury." Evidence of deliberate and calculated indifference to the inherent risks of an action taken against another may be helpful in determining that an act was not accidental, but such a standard is an unnecessary departure from our previous holdings regarding intentional injury. *See R.W. v. T.F.*, 528 N.W.2d at 873 (holding that "while not necessarily malicious," insured's decision to engage in unprotected sexual intercourse with claimant where the insured knew or should have known that he had herpes and that he could transmit the disease through such activity was intentional injury); *Continental Western Ins. Co. v. Toal*, 309 Minn. 169, 177–78, 244 N.W.2d 121, 126 (1976) (holding that although insureds did not specifically intend to injure anyone, they knew accomplices brought loaded guns and

1. The majority argues this dissent hinges on the grammatical structure of the policy language and rejection of our definition of accident in *Hauenstein*. This is plainly incorrect, as no amount of grammatical maneuvering will alter the intentional and injurious character of the actions taken by Walser and Shoemaker.

they followed through with the robbery with the knowledge that someone might well be injured or killed).

The policy at issue does not provide coverage for liability resulting from the conduct presented here. I would affirm the court of appeals.