STATE FARM FIRE AND CASUALTY COMPANY, Appellant,

v.

Gary Harold SCHWICH, Respondent,

Jeanne Carol Stone, Respondent,

Brandon Mitchell Hackbarth, as Trustee for the Next of Kin of Alicia Sue Hackbarth, Respondent.

No. A07–1093.

Court of Appeals of Minnesota.

May 20, 2008.

C. Todd Koebele, William L. Moran, Scott G. Williams, Murnane Brandt, St. Paul, MN, for appellant.

Samuel A. McCloud, McCloud & Heefner, P.A., Shakopee, MN, for respondent Schwich.

Jeanne Carol Stone, Minnesota Correctional Facility, Attn: Warden Mark Carey, Shakopee, MN, pro se respondent.

Sharon L. Van Dyck, Schwebel, Goetz & Sieben, Minneapolis, MN, Michael D. Swor, Swor & Gatto, P.A., St. Paul, MN, for respondent Hackbarth.

Considered and decided by SCHELLHAS, Presiding Judge; KLAPHAKE, Judge; and HALBROOKS, Judge.

## OPINION

KLAPHAKE, Judge.

In this declaratory judgment action, appellant State Farm Fire and Casualty Company challenges the district court's grant of summary judgment to its insured, respondent Gary Harold Schwich. The district court ruled that appellant had a duty to defend and indemnify Schwich under the terms of his homeowners' policy for the wrongful death of Alicia Sue Hackbarth. Schwich provided Hackbarth with methamphetamine for injection, which was a partial cause of her death.

Because intentional, willful, and malicious acts are excluded from coverage and intent to injure can be inferred from the facts and circumstances of Hackbarth's death, and because it is against public policy to require a general liability insurance policy to cover deliberate and serious criminal acts, we reverse.

## FACTS

State Farm Fire and Casualty Company (State Farm) began a declaratory judgment action to determine its duty to defend and indemnify its insured, respondent Gary Harold Schwich, for the death of Alicia Sue Hackbarth. For purposes of summary judgment, State Farm, Schwich, and respondent Brandon Mitchell Hackbarth, who was trustee for the next of kin of Alicia Hackbarth, stipulated to three facts, in addition to the other evidence presented: (1) Schwich provided Hack-barth with methamphetamine (meth) on the night she died; (2) the meth was at least one of the causes of Hackbarth's death; and (3) although Schwich intentionally gave Hackbarth the drug, he did not intend to kill her.

In granting summary judgment in favor of respondents, the district court concluded that (1) Hackbarth's death was not intentional and therefore her death was an accident or occurrence under the policy; (2) liability for Hackbarth's death was not excluded as an intentional, willful, or malicious act, because the harm in question was not substantially certain to result from the insured's conduct; and (3) appellant failed to show that insurance coverage for a criminal act should be void as against public policy.

At the time of her death in March 2005, Hackbarth lived at Schwich's home and had resided there intermittently for about nine months. While living with Schwich, Hackbarth drank heavily, smoked marijuana, and snorted meth, possibly on a daily basis. On March 10, 2005, another friend of Schwich's, Jeanne Carol Stone, moved in; Stone also habitually used meth. Unlike Hackbarth, both Schwich and Stone preferred to inject meth rather than to snort or smoke it, accelerating the onset of the drug's effect. On March 10, after injecting meth with breakfast, Schwich left for work; despite his heavy meth habit, Schwich continued to work full time as a well contractor. The two women spent the day together. Hackbarth snorted meth twice and drank steadily all day long. When Schwich returned home in the evening, he ingested his second dose of meth and then left with Stone to run errands and to stop at some bars. Hackbarth remained at home and continued to drink.

After Schwich and Stone returned home, Schwich had a third dose of meth. Stone

requested meth from Schwich for herself and for Hackbarth. Stone testified that Schwich pressured Hackbarth to try injecting, rather than snorting, the meth and that he prepared two syringes of meth. Stone helped Hackbarth inject the meth, after which Stone retired for the night.

Schwich fell asleep in the master bedroom while Hackbarth sat in a Jacuzzi located in the master bathroom. Schwich woke after a couple of hours, heard the jets in the Jacuzzi and, upon investigating, found Hackbarth floating face down in the Jacuzzi. He called Stone, who attempted to resuscitate Hackbarth. Stone testified that initially Schwich assisted her with Hackbarth, but then he left the room and scurried around the house, disposing of drugs and paraphernalia, and putting his meth-tainted robe in the washing machine. Stone called 911 and continued CPR until the paramedics arrived some ten minutes later. According to the coroner's report, Hackbarth died of cardiac arrhythmia, caused by the underlying factors of acute meth and ethanol intoxication, and arrhythmogenic right ventricular cardiomyopathy, with contributing factors of chronic alcoholism and cigarette smoking.

Schwich had used meth for at least ten years, without apparent ill effects. He testified that he did not consider it to be a dangerous drug and had never heard of anyone overdosing or dying from use of meth, although he acknowledged that a former girlfriend had gone through drug treatment twice; it was an expensive habit; and he would not want his daughter to use it. Schwich clearly knew that meth was illegal; his house and grounds were monitored by closed-circuit cameras and protected by various measures, including hidden microphones and a locked gate.

Schwich was tried and convicted for aiding and abetting third-degree murder: causing the death of another by administering a schedule I controlled substance without intent to cause death. Minn.Stat. § 609.195(b) (2004). Stone pleaded guilty to third-degree unintentional murder. Hackbarth's next of kin initiated a wrongful death action against Schwich, who referred the lawsuit to his insurer, State Farm. State Farm began defending Schwich under a reservation of rights and initiated this declaratory judgment action.

## ISSUES

1. Is liability for Hackbarth's death excluded from coverage as an intentional act?

2. Is liability for Hackbarth's death excluded from coverage as a willful and malicious act?

3. As a matter of public policy, should a general liability insurance policy provide coverage for liability resulting from a serious criminal act?

## ANALYSIS

Construction of an insurance contract is a question of law subject to de novo review. *B.M.B. v. State Farm Fire & Cas. Co.*, 664 N.W.2d 817, 821 (Minn. 2003). When construing a contract, courts give words their plain and ordinary meaning and resolve any ambiguity in favor of the insured. *Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 609 (Minn.2001). We interpret exclusions from coverage under general rules of contract construction, as well; we construe the language of the exclusion in accordance with the expectations of the insured and strictly against the insurer. *Id.* at 613.

*Intentional Act Exclusion*

Schwich's homeowners' policy provides coverage for an "occurrence," which it defines as an "accident," and excludes coverage for expected injuries or injuries caused by intentional acts. Al-

though the policy provides no definition of "accident," *Walser* defines "accident" as "an unexpected, unforeseen, or undesigned happening or consequence," the opposite of "intentional conduct," by which it means conduct "where there is a specific intent to cause injury." *Id.* at 611–12. The questions of whether an injury is the result of an accident and whether coverage is excluded because the injury is the result of an intentional act are "for all practical purposes, identical issues." *Tower Ins. Co. v. Judge,* 840 F.Supp. 679, 690 (D.Minn.1993). Thus, the policy excludes coverage when the insured acts with specific intent to cause injury. *B.M.B.,* 664 N.W.2d at 821.

■ An insurer may establish intent by offering proof of actual intent to injure. *Id.* In *Walser,* although the insured intended the act (pulling a fellow student from the rim of a basketball hoop), he intended no injury, even though the injury was the natural and probable consequence of the insured's action. 628 N.W.2d at 613–14. The supreme court concluded that the resulting injury was unintended or unexpected, and thus not intentional; therefore, the injury was covered under the policy. *Id.* at 612–13.

■ But when actual intent to injure is lacking, an insurer may prove intent to injure by inferring intent as a matter of law. *B.M.B.,* 664 N.W.2d at 822; *State Farm Fire & Cas. Co. v. Wicka,* 474 N.W.2d 324, 329 (Minn.1991). "The general rule is that intent is inferred as a matter of law when the nature and circumstances of the insured's act are such that harm is substantially certain to result." *B.M.B.,* 664 N.W.2d at 822 (quotation omitted).

■ Generally, courts infer intent to injure as a matter of law when the injury involves a criminal act of a serious nature. *See Diocese of Winona v. Interstate Fire & Cas. Co.,* 89 F.3d 1386, 1391 (8th Cir. 1996) (continuing to give known pedophile pastoral assignments); *Woida v. North Star Mut. Ins. Co.,* 306 N.W.2d 570, 573 (Minn.1981) (shooting at an occupied truck with a high-powered rifle); *Iowa Kemper Ins. Co. v. Stone,* 269 N.W.2d 885, 887 (Minn.1978) (wrapping fist with belt and buckle before engaging in fist fight); *Cont'l Western Ins. Co. v. Toal,* 309 Minn. 169, 177–78, 244 N.W.2d 121, 126 (1976) (committing armed robbery); *State Farm Fire & Cas. Co. v. Neises,* 598 N.W.2d 709, 712 (Minn.App.1999), *review denied* (Minn. Nov. 17, 1999) (disinterring, dismembering, and displaying child's corpse).[1]

■ The parties stipulated that although he intentionally gave Hackbarth meth, Schwich did not intend to kill her. Schwich further testified that he did not believe meth to be harmful or that death could result from using meth, although he

---

[1] In limited circumstances, courts decline to find inferred intent despite an actor's commission of a serious criminal act. Generally, this occurs when the actor is deemed to be unable to form the requisite intent because of serious mental illness. *See B.M.B.,* 664 N.W.2d at 826 (answering certified question by concluding that question of whether insured could form intent to injure despite mental illness must be submitted to jury); *Wicka,* 474 N.W.2d at 331 (holding no inferred intent where the mentally ill actor was unable to discern nature or wrongfulness of act or to control conduct). Courts also decline to infer intent when a potentially criminal act involves minor or reflexive conduct. *See Brown v. State Auto. & Cas. Underwriters,* 293 N.W.2d 822 (Minn.1980) (holding that question of whether insured struck baggage clerk reflexively or intentionally during struggle over baggage should be submitted to jury for purposes of determining insurance coverage); *Farmers Ins. Exchange v. Sipple,* 255 N.W.2d 373, 377 (Minn.1977) (question of whether insured struck another intentionally or reflexively during a heated exchange should be submitted to jury for purposes of determining insurance coverage).

acknowledged that a person could become addicted and that it is illegal. When the act is egregious enough, however, courts decline to consider whether the actor thought his actions were harmless. *See, e.g., Am. Family Mut. Ins. Co. v. Peterson*, 405 N.W.2d 418, 421 n. 4 (Minn.1987) (opining that "insured's subjective view that his sexual overtures were not harmful is deemed irrelevant" and citing several supportive cases). Rather, the court must weigh whether the actor "knew or should have known that there was substantial probability that certain consequences will result from his actions.... The results cease to be expected and coverage is present as the probability that the consequences will follow decreases and becomes less than a substantial probability." *Diocese of Winona*, 89 F.3d at 1391 (quotation omitted). The record includes exhibits about the dangers of meth and such information is widely available in public service brochures, on billboards, and in the media; purchase of medications containing the meth precursor drug pseudoephedrine is restricted. It strains credibility for Schwich to assert that he was unaware of the serious dangers posed by meth use. Further, Schwich actively encouraged Hackbarth to inject meth, a potentially more dangerous means of consuming the drug.

We hold that when an insured has knowingly provided an injured party with methamphetamine, by preparing a syringe and encouraging the injured party to inject the drug, intent to injure is inferred as a matter of law, and therefore coverage under the policy is excluded.

*Willful and Malicious Act*

■■■ Schwich's policy also excludes coverage for willful and malicious acts, which are not defined by the policy. As a legal matter, an act that a person knows is wrong and unlawful is malicious and will-

ful. *Neises*, 598 N.W.2d at 712 (quotation omitted). The malicious act exclusion is applied to harm resulting from an act, without regard to whether the act was directed at the injured party. *Id.*

In some ways, this exclusion parallels our discussion of inferred intent. In *Walser*, the court stated that the purpose of the intentional act exclusion is to exclude coverage for wanton and malicious acts; in such a case, absent specific intent, a court may infer intent to injure as a matter of law. 628 N.W.2d at 613. Cases involving malicious acts are usually "factually more extreme": the actor knows or should have known that harm was substantially certain to result, but acts with a deliberate and calculated indifference to the risk of injury. *Id.* at 613–14 (quotation omitted); *see, e.g., State Farm Fire & Cas. Co. v. Williams*, 355 N.W.2d 421, 425 (Minn. 1984) (concluding that sexual assault on a physically disabled person was an intentional act as a matter of law); *Neises*, 598 N.W.2d at 712 (holding that disinterring, dismembering, and displaying child's corpse was malicious and willful act).

■■■ Schwich provided meth to Hackbarth; although he stated that he did not think meth was dangerous, he did know that it was unlawful. In addition, although Hackbarth previously had only inhaled meth, Schwich pressured her to inject herself with meth, a more dangerous delivery method. Schwich knew that providing Hackbarth with meth was unlawful, but he did so regardless of its illegality, *see Neises*, 598 N.W.2d at 712, and did it with a deliberate and calculated indifference to the risk of injury. *See Walser*, 628 N.W.2d at 613. Under either analysis, we conclude that his providing Hackbarth with meth and pressuring her to inject it was a malicious and willful act, within the meaning of the exclusion. Therefore, the

district court erred by finding coverage under the policy.

*Public Policy*

Finally, State Farm argues that it should be against public policy to provide coverage for serious criminal acts. Courts may declare a contract void as against public policy, but it is "a very delicate power" invoked only in "cases free from doubt." *United Steelworkers of Am., Local 6115 v. Quadna Mtn. Corp.*, 435 N.W.2d 120, 122–23 (Minn.App.1989), *review denied* (Minn. Mar. 29, 1989).

Despite this limitation, we will declare an insurance contract void as against public policy under certain circumstances. One consideration stems from the nature of the insurance contract. An insured and an insurer enter into a contract to protect the insured against the occurrence of certain hazards; the insurer spreads the risk across a large pool of insureds to provide liability coverage at reasonable rates. But an insured is not, by commission of an intentional act, permitted to consciously control the risks covered by a policy. *Diocese of Winona*, 89 F.3d at 1391; *Rohrer v. Rick*, 529 N.W.2d 406, 409 (Minn.App. 1995). The mutual understanding of the parties limits coverage to the hazards they intended to be covered by contract. *Id.* at 408. When an insured demands coverage for a serious criminal act, the insurer must spread this risk among the entire pool of insureds, forcing it to pay for a deliberate and avoidable act that was outside the scope of occurrences either party intended to be covered in the insurance contract.

Further, it is against public policy to "licens[e] intentional and unlawful harmful act[s]." *Stone*, 269 N.W.2d at 887. Minnesota courts have repeatedly declined to find liability coverage for unlawful conduct and serious criminal acts. *See R.W. v. T.F.*, 528 N.W.2d 869, 873 (Minn.1995)

(refusing, on public policy grounds, to "promote the abdication of personal responsibility by providing insurance coverage" for knowing transmission of sexually transmitted disease); *Peterson*, 405 N.W.2d at 422 (stating that purpose of intentional act exclusion is "to deny insured license to commit wanton and malicious acts" and noting that "we are not inclined to create a situation where the more drunk an insured can prove himself to be, the more likely he will have insurance coverage"); *Nat'l Union Fire Ins. Co. v. Gates*, 530 N.W.2d 223, 227 (Minn. App.1995) (denying on public policy grounds coverage for criminal acts of physical and sexual abuse), *review denied* (Minn. June 23, 1995).

Although we have not addressed directly the question of liability coverage for injury as the result of providing a Schedule I drug, courts of other jurisdictions have declined to find coverage for injuries related to their use on public policy grounds. In *State Farm Fire & Cas. Co. v. Baer*, 745 F.Supp. 595, 597 (N.D.Cal.1990), the court held that the insured's act of providing an illegal drug to another, despite the fact that the insured intended no harm, precluded coverage as against public policy. The court noted that Schedule I drugs are the most dangerous illegal drugs, with high potential for abuse, no accepted medical use, and no accepted safe standards for use. *Id.* Although the drug at issue in *Baer* was "Ecstasy," the same reasoning applies to meth, also a Schedule I drug.

Likewise, in *Minnesota Fire & Cas. Co. v. Greenfield*, 579 Pa. 333, 855 A.2d 854, 866 (2004), the Pennsylvania Supreme Court held that an insurance policy provides no coverage for injuries resulting when an insured provided the injured party with heroin, a Schedule I drug. The court commented that the public interest in controlling the spread of Schedule I

drugs demands the invalidation of insurance coverage related to heroin use on public policy grounds. *Id.* at 867.

Insurance policies are intended to protect an insured from the consequences of unintended and accidental actions, even those undertaken with breathtaking stupidity and resulting in serious injury. But they are not intended to relieve an insured from the consequences of serious criminal acts, and we, as a matter of public policy, cannot condone coverage for such acts. We therefore hold that extending liability coverage for the act of providing an injured party with meth by preparing a syringe and pressuring the injured party to inject the drug is against public policy.

### DECISION

Schwich's act of supplying the victim, Alicia Hackbarth, with meth, by preparing a syringe and urging her to inject the drug, is both a willful and malicious act and an act for which intent may be inferred. Further, coverage for such acts is against public policy. We therefore conclude that this act is excluded from liability coverage under Schwich's homeowners' policy, and we therefore reverse.

**Reversed.**