**Linda D. HOUSTON, Petitioner, Appellant,**

v.

**INTERNATIONAL DATA TRANSFER CORP., Respondent,**

**COMMISSIONER OF ECONOMIC SECURITY, Respondent.**

No. C1–00–2151.

Supreme Court of Minnesota.

June 13, 2002.

Benjamin L. Weiss, Martha A. Eaves, Southern Minnesota Regional Legal Services, St. Paul, Charles H. Thomas, Mankato, Relator's Attorneys.

Lee B. Nelson, Philip B. Byrne, Department of Economic Security, St. Paul, Respondents' Attorneys.

## OPINION

PAGE, Justice.

Appellant Linda D. Houston was discharged from her employment with respondent International Data Transfer Corp. (International Data) on June 15, 2000. Houston applied for unemployment benefits with respondent Minnesota Department of Economic Security (MDES), but her application was denied because she had been discharged for employment misconduct. Houston appealed and a hearing was held before an unemployment law judge, who found that she had been discharged for reasons other than employment misconduct and, therefore, was qualified to receive unemployment benefits. International Data appealed to the representative of the Commissioner of MDES. The commissioner's representative concluded that Houston had been discharged for employment misconduct as defined by Minn.Stat. § 268.095, subd. 6(a) (2000)[1],

---

1. Section 268.095, subdivision 6(a), provides: Employment misconduct means:
    (1) any intentional conduct, on the job or off the job, that disregards the standards of behavior that an employer has the right to expect of the employee or disregards the employee's duties and obligations to the employer; or

and reversed the unemployment law judge's decision. The court of appeals affirmed. We reverse.

Houston worked for International Data, a security alarm monitoring company, from March 22, 1999, through June 15, 2000. Her duties as an assistant shift supervisor included handling difficult calls from customers and managing five to seven employees during the third shift. According to the factual findings of the commissioner's representative, a dealer from Northern Alarm telephoned International Data on June 13, 2000. The dealer identified himself, and indicated that he was calling about an alarm. Houston then asked the caller for his account number. After the caller told Houston that he did not remember his account number, Houston placed the caller on hold while she attempted to determine who had paged the caller. While the caller was on hold, Houston allegedly talked about the caller on the floor. Houston asked fellow employees whether anyone had heard of Glenno's Pizza. After learning why the caller had been paged, Houston commented to an employee that the caller had given her the incorrect spelling for Glenno's Pizza.

Houston then went back on the line to the caller and thanked him for holding. Houston told the caller that he had been contacted because of a low-battery signal from an alarm. The caller indicated that he knew this and that he wanted the battery put on test until the next day. Houston then asked for a password. The caller provided a four-digit number, at which time Houston indicated that she was not showing a password on the caller's account. The caller again identified his name as well as the company on whose behalf he was calling and Houston responded by saying, "Okay." The caller became irate and yelled at Houston, "You guys gotta listen—gosh." Houston responded by telling the caller that she was "listening to ten different things." Referring to the duration of the test time, she asked the caller, "How long do you want?" The caller replied, "If you'd listen to one thing at a time." Houston again asked, "Sir, what do you want? How long do you want this on test for?" The caller yelled, "Will you listen to a customer for God's sake." Houston asked again, "How long do you want this on test?" The caller responded by stating, "Ahh, for Christ's sake, you don't give a shit, do you? Ten o'clock tomorrow morning. God damn, if you'd listen to one person at a time, you wouldn't get confused." There was a silent pause and the caller said, "Hello?" Houston responded, "I'm still here." The caller then yelled, "Jesus Christ." Houston said, "Excuse me," and said that she was still there. The caller rejoined, "I can be just as smart as you can, lady." Houston asked, "Sir, do you want this on test or not?" The caller replied, "Are you getting lippy? What did I tell you to do with it?" Houston then said, "Look" and was interrupted by the caller who, in an irate tone, said, "Don't tell me look." Houston waited on the line a moment and then hung up the telephone. International Data investigated the complaint from the caller and discharged Houston two days later on the basis that she had been rude to a customer.

After applying for unemployment benefits, Houston received notice that she was disqualified from receiving benefits because she had been discharged for employment misconduct, as defined by Minn.Stat. § 268.095, subd. 6(a). Houston appealed and a hearing before an unemployment

---

(2) negligent or indifferent conduct, on the job or off the job, that demonstrates a substantial lack of concern for the employment.

law judge was held. At the hearing, Kayla Yates, a human resources manager at International Data, testified that Houston had been through multiple training sessions prior to handling the telephone call in question. Houston's training included classes about how to deal with angry customers, how to approach people in difficult situations, and how to deal with difficult people. Yates testified that Houston had an "excellent" and "sterling" history dealing with difficult customers. According to Yates, Houston had "the patience to handle difficult customer calls" and was courteous, helpful, and had always been pleasant on the phone.

Yates explained, however, that rudeness to a caller, such as interrupting, talking over, or hanging up on a caller, is grounds for the employee's immediate discharge under International Data's disciplinary system. She also explained that, as part of their training, International Data's employees are taught to use customer service words during periods of "dead air." Yates then pointed out that Houston did several things during the telephone conversation that brought her conduct within the scope of the company's disciplinary policy. Specifically, Houston (1) did not listen attentively to the caller, (2) talked about the caller on the floor, (3) talked over the caller "very rudely," (4) talked aggressively to the caller, (5) allowed "dead air" while placing the caller's account on test as opposed to using customer service words, and (6) hung up on the customer. Finally, Yates explained that, because of Houston's behavior and International Data's strict policies and procedure, Houston was discharged.

Houston's account of the telephone conversation was consistent with what can be heard on the tape with one exception—she believed that the caller referred to her as a "dumb bitch" before she responded by stating "excuse me." Houston stated that she was not trying to talk over the caller and was simply trying to get the information she needed to assist him. She testified that when she said "look," she "wasn't * * * being sarcastic or being smart," but was "trying to say look, sir, if we can't get anywhere, with him yelling and screaming like he was screaming." Houston also stated that she hung up on the caller because she was trained that she did not have to accept a caller's verbal abuse. Houston stated that after the call she reviewed the conversation with a shift supervisor, who told her that she did not need to worry because employees did not need to put up with such abuse.

The unemployment law judge concluded that Houston "did her best to help the [caller]" and that Houston's hanging up on the caller was "an isolated incident which does not rise to the level of misconduct as defined in [Minn.Stat. § 268.095, subd. 6(a)]." Based on these conclusions, the unemployment law judge found that Houston was not disqualified from receiving benefits.

International Data appealed to the Commissioner of MDES. The commissioner's representative found that Houston's "duties included setting an exemplary example for others and also supporting and enforcing all company policies and procedures" and that Houston "was a supervisor and was knowledgeable of the employer's policies and procedures * * * for handling difficult customers." The representative found that Houston "did not follow the employer's procedures with regard to handling the phone call * * * on June 13, 2000" and that she had "engaged in intentional conduct that disregard[ed] the standards of behavior which the employer had a right to expect of [its] employees or negligent or indifferent conduct that demonstrate[ed] a substantial lack of concern

for the employment." Based on these findings, the commissioner's representative concluded that Houston was disqualified from receiving unemployment benefits because she had been discharged for employment misconduct, as defined under Minn.Stat. § 268.095, subd. 6(a). Thus, the commissioner's representative reversed the unemployment law judge's decision.

Houston then appealed to the court of appeals, arguing that she did not commit misconduct, as defined in *Tilseth v. Midwest Lumber Co.*, 295 Minn. 372, 374–75, 204 N.W.2d 644, 646 (1973).[2] Rejecting this argument, the court of appeals concluded that, unlike *Tilseth*, the statutory definition of "employment misconduct" does not require a "wilful or wanton disregard of an employer's interests" or a "deliberate violation or disregard of standards of behavior." Instead, the court stated that the statutory definition requires only "intentional conduct * * * that disregards the standards of behavior that an employer has the right to expect of the employee." Therefore, the court of appeals concluded that *Tilseth* is no longer good law as to the definition of employment misconduct. The court of appeals went on to affirm the decision of the commissioner's representative. This appeal followed.

Houston makes the same arguments to this court that she made to the court of appeals. She contends that the definition of employment misconduct in Minn.Stat. § 268.095, subd. 6(a)(1) (2000), is ambiguous because the phrase "intentional conduct * * * that disregards the standards of behavior" is reasonably subject to more than one interpretation. Houston acknowledges that the phrase may be interpreted, as the court of appeals did, to mean intentional conduct, which may after the fact be determined to violate a standard of behavior "that an employer has a right to expect." Yet, she argues that "it is equally, if not more, reasonable to interpret that language consistently with *Tilseth*, as requiring an intent to produce the *result* of violating such a standard." In support of this argument, Houston relies on our rules of statutory construction, the terms of the statute, the argument that the statutory language was derived from *Tilseth*, the argument that changes to the definition of employment misconduct, which were made in 1997 and 1999 and have resulted in the current version of Minn.Stat. § 268.095, subd. 6(a), were intended to be technical and not substantive, and this court's interpretation of similar language in other statutes, namely Minn.Stat. § 609.749 (2000) (setting forth the criminal offenses of harassment and stalking).

In response, International Data argues that the legislature expressly repudiated the *Tilseth* definition when it established

---

**2.** The *Tilseth* definition of misconduct provided:

" * * * [T]he intended meaning of the term 'misconduct' * * * is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies [sic] or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed 'misconduct' * * *."

295 Minn. at 374–75, 204 N.W.2d at 646 (quoting *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 296 N.W. 636, 640 (1941)).

section 268.095, subdivision 6(a)(1), as the exclusive definition of employment misconduct. *See* Minn.Stat. § 268.095, subd. 6(e) (2000). International Data further argues that the definition of employment misconduct set out in section 268.095, subdivision 6(a)(1),[3] clearly and unambiguously provides that, for an employee's conduct to constitute misconduct, only the conduct need be intentional, not the disregard itself. According to International Data, the definition does not require that the employee also intended to disregard the standards of behavior the employer has a right to expect. Thus, International Data contends that Houston was properly discharged for employment misconduct under section 268.095, subdivision 6(a)(1).

Before 1997, employment misconduct was undefined by statute. The unemployment compensation statutes provided merely that "discharge for misconduct" was a disqualifying condition for unemployment benefits. *See* Minn.Stat. § 268.09, subd. 1(b) (1996); Minn.Stat. § 268.09, subd. 1(1) (1971). In 1973, this court interpreted the term "misconduct" in *Tilseth*, 295 Minn. at 374–75, 204 N.W.2d at 646. The *Tilseth* definition of "misconduct" remained in place until the legislature statutorily defined the term, now referred to as "employment misconduct," in 1997. *See* Act of Apr. 23, 1997, ch. 66, § 49, 1997 Minn. Laws 357, 387 (codified at Minn.Stat. § 268.09, subd. 12 (Supp. 1997)). In 1999, the legislature amended the definition of employment misconduct to its current form, which we consider in this case:

Employment misconduct means:

(1) any intentional conduct, on the job or off the job, that disregards the standards of behavior that an employer has the right to expect of the employee or

disregards the employee's duties and obligations to the employer; or

(2) negligent or indifferent conduct, on the job or off the job, that demonstrates a substantial lack of concern for the employment.

Act of Apr. 27, 1999, ch. 107, § 44, 1999 Minn. Laws 378, 421 (codified at Minn. Stat. § 268.095, subd. 6(a)).

■ We review questions of statutory construction de novo. *Hibbing Educ. Ass'n v. Public Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn.1985). "The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature. Every law shall be construed, if possible, to give effect to all its provisions." Minn. Stat. § 645.16 (2000); *Boutin v. LaFleur*, 591 N.W.2d 711, 715–16 (Minn.1999). "When the words of a law * * * are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing [its] spirit." Minn. Stat. § 645.16.

■ We first consider the language of the statute. Applying the common and approved usage to the words used in section 268.095, subdivision 6(a)(1), we conclude that, for an employee's conduct to constitute employment misconduct, that conduct must (1) be intentional and (2) disregard standards of behavior the employer has a right to expect or the employee's duties and obligations to the employer.

■ For the conduct to be intentional, it must be deliberate, *Ress v. Abbott Northwestern Hosp., Inc.*, 448 N.W.2d 519, 524 (Minn.1989), and not accidental, *Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 611 (Minn.2001). Here, there is no claim that Houston's conduct was not deliberate.

---

**3.** International Data does not rely on Minn. Stat. § 268.095, subd. 6(a)(2) (2000), in arguing that Houston was discharged for employment misconduct.

Thus, the first prong of subdivision 6(a)(1) is satisfied.

■ As it concerns the second prong of subdivision 6(a)(1), "disregard" means "to pay no attention to; leave out of consideration; ignore[;] * * * to treat without due regard, respect, or attentiveness; slight," *Random House Dictionary of the English Language* 569 (2d ed.1987), or "to pay no heed to; to fail to notice or observe; hence, to slight as unworthy of regard or notice," *Webster's New International Dictionary of the English Language* 753 (2d ed.1947). These definitions contemplate that the word "disregard" includes intent that is separate and distinct from the intent to engage in the conduct in question. Thus, for purposes of disqualification from unemployment compensation on grounds of employment misconduct under the statute, there must be a sufficient showing in the record that the employee not only engaged in intentional conduct, but also intended to, or engaged in conduct that evinced an intent to, ignore or pay no attention to his or her duties and obligations or the standards of behavior the employer has a right to expect. This reading of section 268.095, subdivision 6(a)(1), is consistent with the remedial nature of unemployment compensation and the declared public policy that unemployment benefits are for those who are "unemployed through no fault of their own," Minn.Stat. § 268.03, subd. 1 (2000).[4]

Having thoroughly reviewed the record, we find nothing to indicate that Houston intentionally ignored or paid no attention to her duties and obligations to International Data or the standards of behavior that International Data had a right to expect. Because we find no such disregard, we conclude that the conduct that resulted in Houston's termination was not employment misconduct within the meaning of section 268.095, subdivision 6(a)(1). Therefore, we hold that the commissioner erred when Houston was denied unemployment benefits on the grounds that Houston was discharged for employment misconduct.

Reversed.

GILBERT, Justice (dissenting).

I respectfully dissent from the majority opinion. Minnesota Statutes § 268.095, subd. 6 (2000), unambiguously defines "employment misconduct" and the statutory definition no longer requires that the conduct willfully or wantonly disregard an employer's interests or deliberately violate or disregard the employer's standards of behavior. Rather, the statute clearly states that employment misconduct is any intentional conduct that disregards the standards of behavior that an employer has the right to expect of the employee. As the majority notes, "disregard" means "to pay no attention to; leave out of consideration; ignore[;] * * * to treat without due regard, respect, or attentiveness; slight." Accordingly, an employee that intentionally fails to follow her employer's known policies and procedures and, in doing so, either pays no attention to or neglects to observe the standards of behavior that an employer has the right to expect of the employee, commits "employment misconduct" under Minn.Stat. § 268.095, subd. 6. Contrary to the majority's holding, there simply is no requirement in the statute that the employee must intend to violate or disregard the employer's standards of behavior.

---

4. The term "fault," as used in section 268.03, subdivision 1, necessarily encompasses some degree of culpability.

When interpreting a statute, we first look at whether the statute's language, on its face, is clear and unambiguous. *Am. Family Ins. Group v. Schroedl*, 616 N.W.2d 273, 277 (Minn.2000). Words and phrases in the statute are to be construed according to their plain and ordinary meaning. *Id.* The unambiguous language used in Minn.Stat. § 268.095, subd. 6, defines "employment misconduct." This definition does not include the specific intent element of " 'wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee.' " *Tilseth v. Midwest Lumber Co.*, 295 Minn. 372, 374–75, 204 N.W.2d 644, 646 (1973) (quoting *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 296 N.W. 636, 640 (1941)).

The majority fails to construe Minn.Stat. § 268.095, subd. 6, according to its plain and ordinary meaning. Rather, the majority interprets the statute to say something that its does not—that the employee must intend to ignore or pay no attention to the standards of behavior the employer has a right to expect. While the majority concedes that Houston's conduct was deliberate in the incident at issue, it adds another requirement not contained in the statute by drawing a distinction between an intent to commit the conduct and an intent to commit the conduct that disregards the standards of behavior that an employer has the right to expect of an employee. In this case, Houston was aware of the zero-tolerance policy and, in the heat of the moment, intentionally committed an act that ignored the policy. Although a holding that Houston committed employment misconduct under Minn.Stat. § 268.095, subd. 6, may lead to an unfortunate result for Houston, her employer has rights too, especially in a business that depends on accurate, clear, unemotional communication when alarm calls are received. Hous-

ton's employer has a right to enforce its policies and establish standards of behavior that it has decided are in the best interests of its business. Because Houston's intentional conduct disregarded these standards, she committed employment misconduct and should be disqualified from receiving unemployment compensation benefits.

I would affirm the court of appeals.

ANDERSON, Russell A., Justice (dissenting).

I join in the dissent of Justice Gilbert.

STRINGER, Justice (dissenting).

I join in the dissent of Justice Gilbert.