**Mario S. VARGAS, Relator,**

v.

**NORTHWEST AREA FOUNDATION, Respondent,**

v.

**Commissioner of Employment and Economic Development, Respondent.**

No. A03–498.

Court of Appeals of Minnesota.

Jan. 20, 2004.

Albert T. Goins, Sr., Kathryn R. Burke, Minneapolis, MN, for relator.

Daniel G. Wilczek, Karla C. Robertson, Faegre & Benson, LLP, Minneapolis, MN, for respondent Northwest Area Foundation.

Lee B. Nelson, Philip B. Byrne, Minnesota Department of Employment and Economic Development, St. Paul, MN, for respondent Commissioner.

Considered and decided by TOUSSAINT, Chief Judge; G. BARRY ANDERSON, Judge; and PORITSKY, Judge.*

**O P I N I O N**

G. BARRY ANDERSON, Judge.

Relator appeals the commissioner's representative's decision disqualifying him from the receipt of unemployment benefits as a result of a discharge for employment misconduct for refusing to participate in the employer's performance-improvement plan. Because we find that relator refused to attempt performance of the improvement plan and because refusal to attempt performance of any part of the improvement plan is employment misconduct, we affirm.

**FACTS**

Relator Mario Vargas was employed as an Associate Community Liaison for Northwest Area Foundation (NWAF) from June 2000 until June 19, 2002. Ellery july,[1] NWAF's new Director of Community Activities and Learning, became concerned with various aspects of Vargas's job performance: Vargas was late and unprepared for meetings; he did not treat team members with respect; and he charged excessive amounts to business credit cards. Vargas's direct supervisor, Lisa Hinickle, further noticed that Vargas failed to follow through with assignments and reacted negatively to constructive criticism.

On April 9, 2002, Vargas orally complained of a hostile work environment to NWAF's human resource department and on April 25, he submitted a formal, written complaint. NWAF decided to investigate Vargas's complaint separately from the company's concerns with his job performance and gave Vargas's supervisors permission to continue to work with the employee on the performance issues. After several requests, however, Vargas failed to provide specific instances or documentation for his complaint. NWAF conducted a formal investigation and on June 14,

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. The record and briefs indicate that ellery july does not capitalize his name as a matter of personal preference.

2002, concluded that Vargas's complaint was unfounded.

Before notification of Vargas's complaint, july emailed Vargas to inform him of both july's concerns and his desire to make clear july's expectations. On April 18, july met with Vargas to discuss july's concerns. Vargas asserted that july was a liar and was, among other allegations, racially harassing him. But, when asked to expand, Vargas did not answer. After the meeting, july sent Vargas a second email stating his desire for the two to reach a positive outcome. Hinickle, july, and Vargas met again on May 14, 2002. Vargas was unable to provide july with any specific allegations of harassment as requested but again accused july of harassment and retaliation. When july asked Vargas if he wished to be involved in resolving NWAF's performance concerns, Vargas refused.

On June 10, 2002, july and Hinickle presented Vargas with a performance-improvement plan they had created and informed him of the requirements, deadlines, and need to complete it in order to remain employed. The first part of the plan, to be completed within seven days, required Vargas to research training programs on the issues july had discussed with him. Vargas said he understood the requirements, and on June 12, 2002, Vargas sent a memo to Hinickle stating that he had fully cooperated with july by attending the meetings, the performance plan was in retaliation for his complaint, and he would only reluctantly be involved.

Seven days later, Vargas had not fulfilled any of the requirements of the plan. Hinickle and july stated that when they asked Vargas whether he intended to complete the plan, he said no. Vargas was sent home, and after another unsuccessful meeting, Vargas's employment was terminated on June 19, 2002. The commissioner's representative found that Vargas was discharged for employment misconduct for refusing to participate in the employer's performance-improvement plan.

## ISSUE

Does the evidence sustain the commissioner's representative's finding that relator refused to participate in his employer's performance-improvement plan and does such a refusal, as a matter of law, constitute employment misconduct?

## DECISION

Decisions of the commissioner's representative are accorded particular deference. *Tuff v. Knitcraft Corp.*, 526 N.W.2d 50, 51 (Minn.1995). Whether an employee has engaged in conduct that disqualifies him from unemployment benefits is a mixed question of fact and law. *Schmidgall v. FilmTec Corp.*, 644 N.W.2d 801, 804 (Minn.2002). A determination of the commissioner's representative regarding the reasons for an employee's separation is a factual determination that is to be reviewed in the light most favorable to the decision and may not be disturbed if there is evidence reasonably tending to sustain the finding. *Markel v. City of Circle Pines*, 479 N.W.2d 382, 383–84 (Minn. 1992). But, whether the acts constitute misconduct is a question of law reviewable de novo on appeal. *See Ress v. Abbott Northwestern Hosp., Inc.*, 448 N.W.2d 519, 523 (Minn.1989).

An employee discharged for employment misconduct is disqualified from receiving unemployment benefits. Minn.Stat. § 268.095, subd. 4(1) (2002). At the time of the commissioner's representative's decision, "employment misconduct" was defined as follows

(1) any intentional conduct, on the job or off the job, that disregards the standards of behavior that an employer has the right to expect of the employee or

disregards the employee's duties and obligations to the employer;

. . . .

(b) Inefficiency, inadvertence, simple unsatisfactory conduct, poor performance because of inability or incapacity, or absence because of illness or injury with proper notice to the employer, are not employment misconduct.

Minn.Stat. § 268.095, subd. 6(a)(1), (b) (2002).[2]

Vargas argues that NWAF has the burden to prove by a fair preponderance of the evidence that Vargas was discharged for employment misconduct. The legislature, however, changed the common law burden-of-proof requirements relating to the grant or denial of unemployment benefits. 1999 Minn. Laws ch. 107, § 40. Employment misconduct is now determined without regard to any common law burden of proof. *See* Minn.Stat. §§ 268.069, subd. 2; .101, subd. 2(d); .105, subd. 1(b) (2002). Thus, the commissioner's representative is to conduct a de novo review of the administrative record in making a final decision. Minn.Stat. § 268.105, subd. 2(c) (2002). The commissioner's representative is required to make independent findings of fact and such decisions as those facts require. *Id.* The commissioner's representative here did so.

■ Vargas argues there is insufficient evidence to support the finding that he refused to participate in the performance plan. He argues that his testimony contradicted july's testimony, that there is no further evidence that he refused to participate, and that NWAF actually used the plan as a pretext for firing him because of personal differences. But the record sustains the commissioner's representative's determination that Vargas refused to participate.

■ First, july testified that when asked, Vargas expressly stated he was not planning on participating with the plan. The only evidence that Vargas offers to rebut this testimony is his own testimony denying the statement. When parties have presented conflicting evidence on the record, appellate courts must defer to the commissioner's ability to weigh the evidence; they may not weigh that evidence on review. *Whitehead v. Moonlight Nursing Care, Inc.*, 529 N.W.2d 350, 352 (Minn. App.1995). Further, at the hearing, Vargas admitted that he had not planned on fully cooperating with the performance plan because he felt that to do so would compromise his harassment claim.

Vargas's retaliation claim also fails. There is no credible evidence in the record that the employment termination was for any reason other than his refusal to participate, and the record supports the finding of the commissioner's representative that there was no retaliation. The

---

2. The definition of "employment misconduct" was amended, effective August 1, 2003. 2003 Minn. Laws 1st Spec. Sess., ch. 3, art. 2, §§ 13, 20(g). The new legislation reads as follows:

(a) Employment misconduct means any intentional, negligent, or indifferent conduct, on the job or off the job (1) that evinces a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee, or (2) that demonstrates a substantial lack of concern for the employment.

Inefficiency, inadvertence, simple unsatisfactory conduct, a single incident that does not have a significant adverse impact on the employer, conduct an average reasonable employee would have engaged in under the circumstances, poor performance because of inability or incapacity, good faith errors in judgment if judgment was required, or absence because of illness or injury with proper notice to the employer, are not employment misconduct.

formal investigation of the complaint included interviews with current and former employees, even after Vargas failed to provide requested information. Further, the investigation was done separately from the process dealing with Vargas's job performance. In fact, at the time that Vargas's supervisors first began discussing their concerns, they were unaware that Vargas had made a harassment claim. Additionally, there was no disciplinary action taken against Vargas until he later refused to participate, and july testified that he did not consider taking such action until Vargas failed to cooperate. Viewed in the light most favorable to the commissioner's representative's decision, the evidence overwhelmingly supports the finding that Vargas failed to follow the plan.

 For an employee's conduct to constitute employment misconduct, the "conduct must (1) be intentional and (2) disregard standards of behavior the employer has a right to expect or the employee's duties and obligations to the employer." *Houston v. Int'l Data Transfer Corp.*, 645 N.W.2d 144, 149 (Minn.2002). Conduct is intentional if it is deliberate and not accidental. *Id.* "[T]he word 'disregard' includes intent that is separate and distinct from the intent to engage in the conduct in question." *Id.* at 150. Therefore, in order to be disqualified on grounds of employment misconduct, there must be a sufficient showing in the record that the employee intended to engage in, or actually engaged in, conduct that "evinced an intent to" ignore or pay no attention to the employee's duties and obligations or the standards of behavior the employer had a right to expect. *Id.* A single deliberate act that adversely affects the employer may constitute misconduct. *Ress*, 448 N.W.2d at 524.

 Vargas's actions were intentional. When july first expressed his and Hinick-

le's concerns, Vargas told them that they were wrong and asserted that they were only making such comments to harass him. The commissioner's representative found that Vargas was told the requirements of the plan and informed that his job depended on meeting those requirements. Vargas stated that he understood. But he failed to perform any of the steps of the plan and when asked, he stated that he did not intend to perform it. These actions were neither accidental nor inadvertent. Vargas could have cooperated with his employers on the job performance issues and performed the first steps in the performance plan while, at the same time, cooperating with the harassment investigation.

 Vargas's intentional refusal to attempt any part of the improvement plan demonstrates that he consciously disregarded his duties and obligations. An employer has a right to expect that its employees will abide by reasonable instructions and directions. *McGowan v. Executive Exp. Transp. Enter., Inc.*, 420 N.W.2d 592, 596 (Minn.1988). The general rule is that if the request of the employer is reasonable and does not impose an unreasonable burden on the employee, the employee's refusal to abide by the request constitutes misconduct. *Schmidgall*, 644 N.W.2d at 804. But "what is 'reasonable' will vary according to the circumstances of each case." *Sandstrom v. Douglas Mach. Corp.*, 372 N.W.2d 89, 91 (Minn.App.1985).

 Vargas argues the plan was unreasonable because it was structured in such a way that he did not have a chance to succeed. He claims that the plan was vague, and he was barely given time to read and comprehend it. While we recognize the possibility that performance plans could be used by employers as a pretext to disqualify employees from receipt of bene-

fits, this is not the case here. As discussed above, the evidence supports the finding that there was no retaliation; it does not support Vargas's arguments that the plan was designed so that he would fail.[3]

The performance plan created no unreasonable burden. NWAF had used similar plans in the past, and july testified that NWAF had utilized one for Vargas on a previous occasion. The current plan clearly highlighted the items that Vargas needed to address. It gave him one week to perform the first step, which simply consisted of researching different training options on the Internet or making phone calls. Finally, Vargas presented no evidence, other than his own subjective belief, that the plan was unreasonable.

Vargas argues that he was unable to complete the plan or failed to do so because of negligence or inability. The unemployment benefits statute provides that "poor performance because of inability or incapacity" does not constitute employment misconduct. Minn.Stat. § 268.095, subd. 6(b). Vargas's argument is flawed, however, because there is no evidence that he ever tried to comply with the plan. Because Vargas did not even minimally attempt to comply with the plan, there is no "performance" from which he could be excused. This court has previously found that an employee's intentional refusal to perform a task, as opposed to negligent forgetfulness, supports the commissioner's representative's decision that an employee committed misconduct. *Bi-*

*beau v. Resistance Tech., Inc.,* 411 N.W.2d 29, 32 (Minn.App.1987) (finding employee misconduct when employee deliberately chose to disobey her employer's instructions because she believed the order was "stupid"); *see also Daniels v. Gnan Trucking,* 352 N.W.2d 815, 816 (Minn.App.1984) (stating a refusal to unload a truck was "a deliberate act of insubordination" constituting employment misconduct).

When NWAF gave Vargas the performance plan, they informed him that the fulfillment of the plan was a "decision point" of his employment, and the commissioner's representative found that Vargas failed to comply. Vargas intentionally disobeyed NWAF's reasonable instructions that he improve his job performance and committed employment misconduct as defined by Minn.Stat. § 268.095.

### DECISION

Because Vargas refused to participate in the employer's reasonable performance-improvement plan and because this action constitutes employment misconduct, the commissioner's representative did not err in disqualifying Vargas from unemployment benefits.

**Affirmed.**

---

**3.** It appears from the record that NWAF went well above and beyond the call of duty in working with Vargas. Despite the very clear message from Vargas that he did not intend to participate in any performance-improvement process, multiple opportunities were afforded to him to do so, and even after he referred to july as a liar, his supervisors continued to attempt to work with him, all to no avail. Vargas did not initially question the performance plan nor did he argue that it was onerous or unduly burdensome.