*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0071**

Kelly Elizabeth Nolan,
Relator,

vs.

Great River Federal Credit Union,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed November 2, 2015
Affirmed
Rodenberg, Judge**

Department of Employment and Economic Development
File No. 32888824-3

Kelly Nolan, Sartell, Minnesota (pro se relator)

Great River Federal Credit Union, St. Cloud, Minnesota (respondent)

Lee B. Nelson, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent DEED)

        Considered and decided by Reyes, Presiding Judge; Connolly, Judge; and Rodenberg, Judge.

UNPUBLISHED OPINION

**RODENBERG**, Judge

In this certiorari appeal, relator Kelly Nolan challenges the decision of the unemployment-law judge (ULJ) that she is ineligible for unemployment benefits. Despite multiple unsupported findings of fact and other errors by the ULJ, because relator's testimony amounts to an admission of employment misconduct, we affirm.

**FACTS**

Relator was employed by Great River Federal Credit Union from May 2007 until her discharge in September 2014. The credit union's policies prohibit employees from performing transactions concerning family members' accounts, including inducing other employees to conduct specific transactions for family members that violate the credit union's procedures. Employees are also prohibited from accessing unauthorized accounts, including family members' accounts. In her application for unemployment benefits, Relator stated that she was discharged because "we are not suppose[d] to help family members in any[ ]way" due to the policies' prohibition against employees doing "anything [concerning] a relative[']s account."

On September 12, 2014, relator's mother contacted relator at work and asked her to transfer money from the mother's account. Relator "looked at [the first teller and] said my mom is on the phone, she wants to know if she can transfer money." The first teller accessed the mother's account and told relator that she could not process the transfer because the mother's loan was past due and there was a memo placing a hold on the

2

account. Relator told her mother about the situation, and her mother indicated that there must have been a mistake because the loan was not past due.

Relator then contacted the collections representative to discuss the hold on her mother's account. Relator agrees that she electronically accessed her mother's account statement during this conversation. After the conversation concluded, Relator again communicated with the first teller concerning the transfer. The first teller processed the transaction. Later that afternoon, relator communicated with a loan officer, who stated that the hold would remain on the account until an audit was completed, and therefore no money could be transferred from the account.

Relator's mother went to the credit union the following day to request a withdrawal. Relator explained the situation to a second teller. She told her that making the transfer was "completely [the second teller's] decision." The second teller processed the transaction.

On September 15, 2014, relator was discharged for violating the credit union's internal accounts, personal conduct, and fraud policies. Relator sought unemployment benefits from the Minnesota Department of Employment and Economic Development (DEED). On September 26, 2014, DEED issued its determination, concluding that relator was ineligible for benefits because she had been discharged for misconduct.

A telephone hearing was held on October 28, 2014. The ULJ heard testimony from relator, relator's mother, the credit union's chief operations officer, the credit union's human resources administrator, and the credit union's teller supervisor. The credit union's live witnesses based their testimony regarding relator's discharge on the

3

involved individuals' unsworn, unsigned statements, and the live witnesses had no personal knowledge of the events surrounding relator's discharge. The chief operations officer testified that the second teller told her that the teller had been uncomfortable processing the transaction because of the hold. Relator testified that she had only violated the policy of accessing a family member's account by "pulling up" her mother's statement, but had not "physically" performed any transactions on her mother's account and did not tell anyone else to conduct the transactions. Relator's mother confirmed that relator assisted her in addressing issues with her account.

The ULJ concluded that relator was discharged because of employment misconduct and was therefore ineligible for unemployment benefits. The ULJ found that relator's act of asking the second teller to conduct the transaction without informing her that the hold remained on the account pending an audit amounted to "a breach of trust and honesty owed" that relator owed to the credit union, which constituted a "serious violation of standards of behavior which [the credit union] had a right to reasonably expect of her." The ULJ affirmed his decision on reconsideration, concluding that relator failed to show good cause for not having submitted additional evidence at the initial hearing that she requested to be considered on reconsideration, and that the evidence was not likely to change the outcome of the decision in any event. The ULJ purported to find on reconsideration that the testimony given by the credit union's witnesses was the "more probable, realistic and plausible description of the events surrounding" relator's discharge. This certiorari appeal followed.

4

**DECISION**

The purpose of chapter 268 is to assist those who are unemployed through no fault of their own. Minn. Stat. § 268.03, subd. 1 (2014). The chapter is remedial in nature and must be applied in favor of awarding benefits, and any provision precluding receipt of benefits must be narrowly construed. Minn. Stat. § 268.031, subd. 2 (2014).

When reviewing the decision of the ULJ, we defer to the ULJ's credibility determinations if they are supported by substantial evidence. *Compare Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 345 (Minn. App. 2006) (stating that "[c]redibility determinations are the exclusive province of the ULJ and will not be disturbed on appeal") *with Wichmann v. Travalia & U.S. Directives, Inc.*, 729 N.W.2d 23, 29 (Minn. App. 2007) (stating that the ULJ's credibility determinations will be upheld if supported by substantial evidence) (citing *Ywswf v. Teleplan Wireless Servs., Inc.*, 726 N.W.2d 525, 532-33 (Minn. App. 2007) (upholding a ULJ's credibility determination after subjecting it to substantial evidence review)). In conducting this review, we may reverse or modify the ULJ's decision if "substantial rights . . . may have been prejudiced" because the findings are "unsupported by substantial evidence in view of the entire record as submitted." Minn. Stat. § 268.105, subd. 7(d) (Supp. 2015).

An employee who is discharged for employment misconduct is ineligible to receive unemployment benefits. Minn. Stat. § 268.095, subd. 4(1) (2014). "Employment misconduct" is "any intentional, negligent, or indifferent conduct, on the job or off the job that displays clearly: (1) a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee; or (2) a substantial lack of concern for

5

the employment." Minn. Stat. § 268.095, subd. 6(a)(1)-(2) (2014). "Whether an employee committed employment misconduct is a mixed question of fact and law." *Peterson v. Nw. Airlines Inc.*, 753 N.W.2d 771, 774 (Minn. App. 2008). Whether the employee committed the act is a fact question. *Skarhus*, 721 N.W.2d at 344. But whether the employee's act constitutes employment misconduct is a question of law, which we review de novo. *Stagg v. Vintage Place Inc.*, 796 N.W.2d 312, 315 (Minn. 2011).

"An employer has a right to expect that its employees will abide by reasonable instructions and directions." *Vargas v. Nw. Area Found.*, 673 N.W.2d 200, 206 (Minn. App. 2004), *review denied* (Minn. Mar. 30, 2004). "As a general rule, refusing to abide by an employer's reasonable policies and requests amounts to disqualifying misconduct." *Schmidgall v. FilmTec Corp.*, 644 N.W.2d 801, 804 (Minn. 2002). A knowing violation of an employer's directives, policies, or procedures is employment misconduct because it demonstrates a willful disregard of the employer's interests. *Id.* at 806.

Relator challenges the ULJ's findings, arguing that they are not supported by substantial evidence. Relator makes two arguments concerning the ULJ's factual findings: (1) that the ULJ's finding that relator failed to let the second teller know about the audit on her mother's account is unsupported by the second teller's written statements; and (2) that relator never told either teller to "perform illegal transactions" and that both tellers were "aware of what was happening" on the account.

The ULJ did not find that the second teller was unaware of the audit as relator argues. Instead, the ULJ found that relator failed to tell the second teller that the hold on

her mother's account "would not be removed until an audit." But the second teller's written statements indicate that she *was* aware that the hold on the account prohibited withdrawals. Relator explained the situation to the second teller and told her that it was her decision whether or not to process the transaction. Additionally, the chief operations officer testified that the second teller told her that she had been uncomfortable processing the transaction because of the hold. On this issue, the record supports no conclusion other than that the second teller *was* aware that the hold existed during the pendency of the audit and completed the transaction anyway.

Concerning relator's second argument that the ULJ found that relator induced the tellers to "perform illegal transactions," relator misreads the ULJ's decision, which apparently focuses solely on the second transaction. And the ULJ's findings concerning that second transaction find no support in the record.

Our review of the record reveals several additional factual errors in the ULJ's decision, including findings concerning the amount of time relator worked for the credit union and relator's hourly wage, and references to relator by two separate, incorrect names. Moreover, the ULJ's claimed credibility determination that the testimony given by the credit union's witnesses was the "more probable, realistic and plausible description of the events surrounding" relator's discharge appears to be nothing more than boilerplate language that makes no sense in context. The credit union's live witnesses based their testimony concerning relator's discharge exclusively on the involved individuals' unsworn, unsigned statements because the live witnesses lacked personal knowledge of the events surrounding the discharge. There was hearsay

7

testimony through the chief operations officer of what the second teller said, but the second teller did not testify at the hearing. While a ULJ "may receive any evidence that possesses probative value, including hearsay, if it is the type of evidence on which reasonable, prudent persons are accustomed to rely in the conduct of their serious affairs," Minn. R. 3310.2922 (2015), it is unclear how the ULJ could find the unsworn and hearsay statements of non-witnesses more credible than relator's without expressly evaluating the credibility of the written statements in some fashion. The ULJ engaged in no such evaluation that we can discern.

Notwithstanding the glaring errors by the ULJ, relator's own testimony conclusively shows that she committed employment misconduct. The credit union's policies prohibit employees from performing transactions on family member's accounts, inducing other employees to conduct specific transactions for family members that violated the credit union's procedures, or accessing unauthorized or family members' accounts. These policies are reasonable and require that employees show "no preferential treatment" and demonstrate "sound fiduciary responsibility." Relator agrees that she was aware of these policies, describing them as "we are not suppose[d] to help family members in any[ ]way" and that employees are prohibited from doing anything regarding a relative's account. Despite this knowledge, relator admits that she "looked at [the first teller and] said my mom is on the phone, she wants to know if she can transfer money." Relator admits that, upon the first teller's discovery of the hold, relator involved herself in the transaction and contacted the collections representative to discuss the hold on her mother's account. Relator also admits that she violated the credit union's policy of

accessing a family member's account by "pulling up" her mother's account statement. Relator admits that she explained her mother's situation to the second teller before that teller processed the second transaction. While relator denies that she instructed the tellers to conduct the transactions, her own testimony conclusively establishes that she violated the credit union's policy by engaging with these employees on her mother's behalf. Relator's knowing disregard of the credit union's reasonable policies constitutes employment misconduct. Even accepting all of relator's testimony as true, she is ineligible for unemployment benefits.

**Affirmed.**