*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0626**

In the Matter of the Athlete Agent Application of Donald Walthall

**Filed February 13, 2017
Affirmed
Larkin, Judge**

Department of Commerce
File No. 5-1000-32503

Bobby Joe Champion, Karlowba R. Adams Powell, Champion Law, Minneapolis, Minnesota (for relator)

Lori Swanson, Attorney General, Christopher M. Kaisershot, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Considered and decided by Connolly, Presiding Judge; Larkin, Judge; and Reyes, Judge.

## UNPUBLISHED OPINION

**LARKIN**, Judge

Relator challenges respondent Minnesota Commissioner of Commerce's denial of his application for registration as an athlete agent, arguing that the commissioner erred in weighing the relevant statutory factors. We affirm.

**FACTS**

In 2002, relator Donald Walthall formed Universal Mortgage, Inc. (Universal), a residential-mortgage-origination business, and became its chief executive officer. Universal served as a fiduciary agent for mortgage lenders. As a fiduciary agent, Universal was required to provide truthful information to lenders on behalf of loan applicants and to process loans approved by lenders. In December 2004, the Minnesota Department of Commerce (department) licensed Walthall as a real-estate-closing agent, and the State of Minnesota commissioned Walthall as a notary public.

In 2005, Walthall financed his purchase of eight Minneapolis properties through Universal. Walthall falsified information on all eight loan applications. For example, each loan application indicated that Walthall intended to occupy the property as his primary residence. Walthall used a different lender for each loan and omitted prior property purchases from seven of the loan applications. Walthall inflated the purchase price in seven of the loan applications and retained the $240,000 difference between the actual purchase prices and the loan proceeds.

In December 2007, the state charged Walthall with one count of felony racketeering and four counts of felony theft by swindle. The state also charged Universal with one count of felony racketeering and 24 counts of felony theft by swindle. The state alleged that Walthall used "straw buyers"[1] to purchase residential properties at inflated prices. The

---

[1] A "straw buyer" of real estate is one who buys property at the direction of another, at a price dictated by the other, with funds arranged for by the other, generally in the form of a bank loan.

charged conduct was unrelated to Walthall's initial purchase of the eight Minneapolis properties. The state charged Walthall with eight additional counts of felony theft by swindle based on those purchases in January 2008. In August 2008, the district court found Walthall guilty of the eight counts of theft by swindle. Later, Walthall pleaded guilty to the December 2007 felony racketeering charge, and the state dismissed the remaining theft-by-swindle charges. The district court sentenced Walthall to serve 74 months in prison.

In June 2011, respondent Minnesota Commissioner of Commerce revoked Walthall's real-estate-closing-agent license and notary commission, and barred him from "engaging in residential mortgage origination or servicing." The commissioner adopted an administrative-law judge's (ALJ) finding that in 2009, the district court entered a civil judgment of $93,834 against Walthall for his participation in defrauding a mortgage lender in 2007. The commissioner concluded:

> The misconduct underlying [Walthall's] convictions for felony racketeering and felony theft by swindle demonstrates that he violated a standard of conduct, committed fraudulent, deceptive, or dishonest practices; and engaged in acts that demonstrate that he is untrustworthy, financially irresponsible, or otherwise incompetent or unqualified to act under the authority or license granted by the Commissioner.

The commissioner also concluded that the department had shown by a preponderance of the evidence that Walthall defrauded the mortgage lender in 2007. The commissioner fined Walthall $330,000. At the time of the proceeding underlying this appeal, Walthall had not made any payment toward the fine.

In November 2014, Walthall completed his sentence for his mortgage-fraud convictions. In December 2014, Walthall sought an informal opinion from the department

3

regarding whether it would allow him to register as an athlete agent if he applied. A department staff member advised Walthall that she would recommend denying his application because of the "nature and seriousness of the underlying conduct resulting in the criminal charges and conviction reflected on [his] record." The staff member also expressed concern regarding Walthall's outstanding $330,000 fine.

In March 2015, Walthall formally applied to register as an athlete agent. The department notified Walthall that it intended to deny his application. Walthall requested and received a contested-case hearing before an ALJ under the Minnesota Administrative Procedure Act, Minn. Stat. §§ 14.57-.62 (2016). The ALJ recommended that the commissioner allow Walthall to register as an athlete agent. The commissioner rejected the ALJ's recommendation and denied Walthall's application. This appeal by writ of certiorari follows.

### D E C I S I O N

This court presumes agency decisions are correct. *Fine v. Bernstein*, 726 N.W.2d 137, 142 (Minn. App. 2007), *review denied* (Minn. Apr. 17, 2007). We may reverse an agency's decision if a petitioner's substantial rights may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are in violation of constitutional provisions, in excess of the statutory authority or jurisdiction of the agency, made upon unlawful procedure, affected by other error of law, unsupported by substantial evidence in view of the entire record as submitted, or arbitrary or capricious. Minn. Stat § 14.69 (2016). An "agency's conclusions are not arbitrary and capricious so long as a rational connection between the facts found and the choice made has been articulated." *In*

4

*re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 277 (Minn. 2001) (quotation omitted).

We evaluate the evidence on which the agency relied in view of the entire record as submitted. *Pomrenke v. Comm'r of Commerce*, 677 N.W.2d 85, 94 (Minn. App. 2004), *review denied* (Minn. May 26, 2004). "If an agency engaged in reasoned decision-making, a reviewing court will affirm, even though it may have reached a different conclusion than the agency." *Id.* "When parties have presented conflicting evidence on the record, appellate courts must defer to [a] commissioner's ability to weigh the evidence; they may not weigh that evidence on review." *Vargas v. Nw. Area Found.*, 673 N.W.2d 200, 205 (Minn. App. 2004), *review denied* (Minn. Mar. 30, 2004).

> Because we must afford deference to the agency's decision, our review of [a] Commission's decision is guided by the principle that the agency's conclusions are not arbitrary and capricious so long as a rational connection between the facts found and the choice made has been articulated. If there is room for two opinions on a matter, the Commission's decision is not arbitrary and capricious, even though the court may believe that an erroneous conclusion was reached.

*In re Review of 2005 Annual Automatic Adjustment of Charges*, 768 N.W.2d 112, 120 (Minn. 2009) (citation and quotation omitted).

"The standard of review is not heightened where the final decision of the agency decision-maker differs from the recommendation of the ALJ." *Blue Cross*, 624 N.W.2d at 278. The agency decision-maker must weigh all of the evidence presented and come to an independent decision but "owes no deference to any party in an administrative proceeding, nor to the findings, conclusions, or recommendations of the ALJ." *Id.*

5

With these standards in mind, we turn to the substantive issues in this appeal.

## I.

Minnesota law prohibits an individual from acting as an athlete agent without a certificate of registration. Minn. Stat. § 81A.04, subd. 1 (2016). An "athlete agent" is an "individual who enters into an agency contract with a student athlete or, directly or indirectly for remuneration, recruits or solicits a student athlete to enter into an agency contract." Minn. Stat. § 81A.02, subd. 3 (2016). Individuals may request registration as an athlete agent from the commissioner of commerce. Minn. Stat. § 81A.02, subd. 5 (2016); Minn. Stat. § 81A.05, subd. 1 (2016).

"The commissioner may refuse to issue a certificate of registration if the commissioner determines that the applicant has engaged in conduct that has a significant adverse effect on the applicant's fitness to act as an athlete agent." Minn. Stat. § 81A.06, subd. 2(a) (2016). When making this determination, the commissioner may consider whether the applicant has:

> (1)   been convicted of a crime that, if committed in this state, would be a crime involving moral turpitude or a felony;
> (2)   made a materially false, misleading, deceptive, or fraudulent representation in the application or as an athlete agent;
> (3)   engaged in conduct that would disqualify the applicant from serving in a fiduciary capacity;
> (4)   engaged in conduct prohibited by section 81A.14;
> (5)   had a registration or licensure as an athlete agent suspended, revoked, or denied or been refused renewal of registration or licensure as an athlete agent in any state;
> (6)   engaged in conduct the consequence of which was that a sanction, suspension, or declaration of ineligibility to participate in an interscholastic or intercollegiate athletic event was imposed on a student athlete or educational institution; or

6

(7) engaged in conduct that significantly adversely reflects on the applicant's credibility, honesty, or integrity.

*Id.*

When deciding whether to refuse to issue a certificate of registration based on conduct that has a significant adverse effect on the applicant's fitness to act as an athlete agent, "the commissioner shall consider:  (1) how recently the conduct occurred; (2) the nature of the conduct and the context in which it occurred; and (3) any other relevant conduct of the applicant."  Minn. Stat § 81A.06, subd. 2(b) (2016).

Walthall assigns error to the commissioner's consideration of the discretionary and mandatory factors.  We address each in turn.

*Discretionary Factors under Minn. Stat. § 81A.06, subd. 2(a)*

In denying Walthall's application, the commissioner determined that discretionary factors (1), (3), and (7) weigh heavily against the application.  The commissioner reasoned that Walthall's "conviction on eight counts of felony theft-by-swindle and felony racketeering are *two separate convictions*," that the convictions were for "crimes involving moral turpitude," that the "convictions reflect very poorly on [Walthall's] credibility, honesty, and integrity," and that Walthall's fraudulent misconduct in the mortgage industry "would disqualify him from serving in a fiduciary capacity."

Walthall does not assign error to the commissioner's reliance on discretionary factors (1), (3), and (7) or the commissioner's attendant reasoning.  Instead, he takes issue with the commissioner's conclusion that "[n]one of the discretionary factors . . . weigh in favor of [his] Application."  Specifically, Walthall argues that discretionary factors (2), (5),

7

and (6) weigh in favor of his application. He notes that he "fully complied and was truthful in his application" and that "[h]e did not make any materially false, misleading, deceptive, or fraudulent representations in his application or as an athlete agent." He further notes that he "has never had a registration or licensure as an athlete agent suspended, revoked, or denied or been refused renewal of registration or licensure as an athlete agent in any state." Lastly, he notes that he "did not engage in conduct the consequence of which was that a sanction, suspension, or declaration of ineligibility to participate in an interscholastic or intercollegiate athletic event was imposed on a student athlete or education institution."

Walthall therefore argues that it is "quite evident" that factors (2), (5), and (6) weigh in his favor. He further argues that "[a]lthough the [commissioner] is not required to consider these elements, to blatantly disregard them is most telling, and tends to suggest that the [commissioner] failed to conduct a thorough statutory analysis."

Walthall's point has some merit. Although the commissioner was not required to consider or address any of the discretionary factors, and the clear statutory language does not suggest that if the commissioner relies on some of the discretionary factors, the commissioner must consider all of the discretionary factors, the commissioner stated that "[n]one of the discretionary factors . . . weigh in favor of [Walthall's] Application," implying that he considered *all* of the factors. To the extent that the commissioner did so, the record establishes that factors (2), (5), and (6) weigh in Walthall's favor.

*Mandatory Factors under Minn. Stat. § 81A.06, subd. 2(b)*

Walthall argues that the commissioner "improperly weighed" the mandatory factors under Minn. Stat. § 81A.06, subd. 2(b). As to the first mandatory factor, Walthall argues

8

that the commissioner erred in concluding that insufficient time had passed since he engaged in mortgage fraud. The commissioner reasoned, "While it has thus been over eight years since [Walthall's] last criminal acts, for most of those years [Walthall] was incarcerated and thus presumably unable to engage in mortgage fraud or other criminal enterprises." The commissioner concluded, "The fact that it has been more than eight years since [Walthall] engaged in criminal fraud does not demonstrate that he is unlikely to engage in criminal acts in the future. Accordingly, factor (1) is at best neutral."

According to a complaint in the record, Walthall most recently committed mortgage fraud in July 2006. Using this date, Walthall applied for athlete-agent registration approximately eight years and eight months after his most recent act of mortgage fraud. The commissioner's determination that it has been over eight years since Walthall committed mortgage fraud is therefore supported by the record.

Walthall argues, "[T]hat is still 8 years ago. Moreover, [he] does not have any prior or subsequent criminal history outside of the incidents that led to his conviction in 2008." Walthall goes on to assert that "no prior or subsequent history . . . is clearly[,] as outlined in M.S.A. section 81A.06, [subd.](b)(1)[,] a factor that 'shall' not 'may' be considered by the Commissioner" and "[t]his factor was clearly not considered." Walthall's assertion is not supported by the relevant statutory language, which requires the commissioner to consider "how recently the conduct occurred." Minn. Stat § 81A.06, subd. 2(b)(1). It does not require the commissioner to consider lack of prior or subsequent criminal history.

Walthall argues that his "criminal conduct occurred a very long time ago, which clearly weighs heavily in favor of his application." Essentially, Walthall invites us to

reweigh the evidence and substitute our assessment of the recency factor for the commissioner's. Under the applicable standards of review, we cannot reweigh the evidence or substitute our judgment for that of the commissioner. *See Vargas*, 673 N.W.2d at 205.

As to the second mandatory factor, Walthall argues that his criminal conduct occurred during his work as a real-estate-mortgage originator and loan officer, that his convictions stemmed from real-estate transactions, and that the real-estate context "is not analogous to the athlete agent area." Walthall therefore disagrees with the commissioner's conclusion that factor (2) weighs heavily against his application, arguing that "[u]nder such an analysis, an individual would never overcome the stigma of a felony conviction and could never register."

In determining that factor (2) weighs heavily against Walthall's application, the commissioner reasoned that his

> mortgage fraud schemes were an egregious violation of law and the fiduciary obligations he owed to lenders and the straw borrowers he set up to fail. These violations undermine [Walthall's] fitness to act as an agent for others. The violations [Walthall] engaged in both by his company and individually cannot be squared with the obligations that he would have as an Athlete Agent.

The commissioner explained that he was "very concerned that [Walthall] intends to engage in being an Athlete Agent by using a company that is structured in the same fashion as [his prior mortgage company] and will employ one of the co-conspirators in [his] mortgage fraud schemes." The commissioner also explained that his concern was compounded because Walthall would be "working with relatively unsophisticated

10

consumers in student athletes, who likely will not understand complex compensation schemes or endorsement deals."

The commissioner concluded that:

> [Walthall's] history of taking advantage of unsophisticated consumers in his mortgage fraud schemes, coupled with the fact that there is no conclusive evidence in the record of what [Walthall's] payment arrangements will be or whether he will handle student athletes' money, all weigh heavily against granting the application. Even the ALJ found that these facts gave him "reason to pause and consider [Walthall's] fitness." The Commissioner agrees that these facts should give us pause . . . . [And] the Commissioner finds that factor (2) weighs heavily against the Application.

(Citation omitted.)

Walthall counters, "It is important that ex-offenders be afforded the opportunity to obtain gainful employment in upstanding and viable professional occupations, so that a criminal conviction does not become a life-long penalty." He complains that the department continues to punish him for his past criminal conduct.

Walthall's suggestion that the commissioner erred by relying on his criminal history is inconsistent with the plain language of the governing statute. When the commissioner refuses to issue a certificate of registration based on prior "conduct that has a significant adverse effect on the applicant's fitness to act as an athlete agent," the commissioner must consider "the nature of the conduct and the context in which it occurred." Minn. Stat. § 81A.06, subd. 2(a), (b)(2). This requirement would be significantly undermined if criminal convictions were excluded from the analysis.

11

Moreover, we note that an athlete agent is authorized to negotiate a professional sports-service contract or an endorsement contract on behalf of a student athlete. *See* Minn. Stat. § 81A.02, subds. 2-3 (2016) (defining "Athlete agent" and "Agency contract"). We easily envision the ways that an athlete agent—like a mortgage originator—would have the opportunity to abuse the trust of his clients in such financial matters. It is undisputed that Walthall abused his fiduciary position of trust as a mortgage originator on multiple occasions. The commissioner reasonably concluded that the athlete-agent context is sufficiently analogous to the real-estate context in which Walthall engaged in extensive, criminal financial fraud and that the nature and context of Walthall's prior fraudulent conduct weighs heavily against his application.

As to the third mandatory factor, Walthall argues that the commissioner "overlooked [his] valiant efforts to turn his life around" and gave too much weight to his failure to make any payment toward his outstanding $330,000 civil fine. He asserts that the commissioner "only focused on the negative factors" when considering his application.

The third mandatory factor requires the commissioner to consider "any other relevant conduct of the applicant." Minn. Stat. § 81A.06, subd. 2(b)(3). The record shows that the commissioner considered positive factors when assessing Walthall's application, but reasoned that those positive factors were neutralized by other circumstances. For example, the commissioner recognized that Walthall cooperated with authorities in prosecuting other mortgage-fraud cases. But the commissioner noted that Walthall did so as part of a plea agreement. The commissioner also recognized that Walthall "completed various educational courses while incarcerated and earned a Bachelor of Science degree."

12

But the commissioner noted that, since Walthall's release from custody, he "has not held a position of trust to demonstrate his capability to handle these responsibilities."

Although the commissioner weighed Walthall's "failure to make any payments on the $330,000 civil penalty" against his application, the commissioner explained his reasoning. The commissioner stated, "[T]he purpose of imposing sanctions is to protect the public and to deter future misconduct by others. These purposes would be undermined if the application was granted even though the civil penalty is outstanding."

Walthall dismisses the commissioner's explanation as "clever." He asserts that "legislative intent was not to base an applicant's fitness to act as an athlete agent on whether or not [he] possessed the financial means to pay a civil penalty." He argues that the commissioner "assigns relevance to payment of a civil penalty under the guise of public safety"[2] and that such reasoning "defies logic and . . . continues to perpetuate the painful reality in our society where the financially able 'the haves' are able to get justice while the poor 'the have nots' are perpetually left without." Walthall concludes, "This is not what the Minnesota legislature intended."

Walthall summarily asserts, without legal support, that "[i]f the Minnesota Legislature had intended payment of a civil penalty to be determinative of one's fitness as an athlete agent it would have said so specifically" and that the commissioner "cannot go against the legislative intent and reinterpret the law, [he] must rely on the plain language of the law." Walthall's argument is unpersuasive because the plain language of the statute

---

[2] We note that the commissioner's explanation generally refers to protecting the public, and not to "public safety."

13

broadly authorizes the commissioner to consider "other relevant conduct." *Id.* That language does not preclude consideration of an applicant's failure to satisfy a financial obligation stemming from "conduct that has a significant adverse effect on the applicant's fitness to act as an athlete agent." *Id.*, subd. 2(a).

We are sympathetic to Walthall's inability to pay the $330,000 civil penalty. But given the broad statutory language, the absence of legal authority suggesting that the commissioner contravened legislative intent by considering Walthall's failure to make "any" payments, and the commissioner's reasonable explanation regarding why he deemed that failure relevant, we cannot say that the commissioner erred, especially when the commissioner ultimately concluded that factor (3) is neutral. A reasonable mind could disagree with that conclusion, but we cannot substitute our judgment for that of the commissioner.

*Conclusion*

In conclusion, we discern error in the commissioner's application of the discretionary factors, but not the mandatory factors. Given the entire record as submitted, the discretionary-factor error does not justify reversal. The commissioner's factual findings are supported by substantial evidence, the commissioner explained his application of the governing statute, and the commissioner's explanation reveals reasoned decision-making. We do not believe that the discretionary-factor error compromises the commissioner's ultimate decision that it is "not in the public interest to grant [Walthall's] application." *See* Minn. R. Civ. P. 61 (stating that harmless error shall be ignored).

14

We join the commissioner in commending Walthall's "efforts to educate himself and earn not only a bachelor's degree while incarcerated but also a master's degree," as well as Walthall's pursuit of employment after he completed his sentence. However, we must respect the commissioner's statement that he is "also mindful that he is entrusted with protecting the public from the risk of unscrupulous actors that fall within his jurisdiction, pursuant to his duties and responsibilities." Unlike the commissioner, we cannot weigh the evidence or independently assess the statutory factors in light of the evidence. The standards that govern our review simply do not allow us to substitute our judgment for that of the commissioner. *See In re 2005 Adjustment*, 768 N.W.2d at 120. And under those standards, there is no basis to reverse the commissioner's denial of Walthall's application.

**Affirmed.**